IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR: | |
| A SEARCH WARRANT FOR THE RESIDENCES LOCATED AT: | |
| 41 HORSESHOE DRIVE, REYNOLDSVILLE, PA 15851; | Magistrate No. 21-1765 **[UNDER SEAL]** |
| 44 HORSESHOE DRIVE, REYNOLDSVILLE, PA 15851; | Magistrate No. 21-1766 **[UNDER SEAL]** |
| 1602 SALEM ROAD, DUBOIS, PA 15801; | Magistrate No. 21-1767 **[UNDER SEAL]** |
| 221 VAN NESS STREET, SYKESVILLE, PA 15865; | Magistrate No. 21-1768 **[UNDER SEAL]** |
| 1957 CLARK ROAD, OLANTA, PA 16863; | Magistrate No. 21-1769 **[UNDER SEAL]** |
| 232 SEABRIGHT STREET, PITTSBURGH, PA 15214; | Magistrate No. 21-1770 **[UNDER SEAL]** |
| 2915 POTOMAC AVENUE, PITTSBURGH, PA 15216; | Magistrate No. 21-1771 **[UNDER SEAL]** |
| 2805 CUSTER AVENUE, PITTSBURGH, PA 15227; | Magistrate No. 21-1772 **[UNDER SEAL]** |
| 3582 ROUTE 219, BROCKWAY, PA 15824. | Magistrate No. 21-1773 **[UNDER SEAL]** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
A SEARCH AND SEIZURE WARRANT
BY TELEPHONE
OR OTHER RELIABLE ELECTRONIC MEANS**

I, Eric Harpster, Task Force Officer ("TFO"), Drug Enforcement Administration ("DEA"), United States Department of Justice, being duly sworn, states as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants to search the following premises described as:

**TARGET RESIDENCE 1**: 41 Horseshoe Drive, Reynoldsville, PA 15851, hereinafter "**TARGET RESIDENCE 1**," further described in Attachment A-1, for the things described in Attachment B;

**TARGET RESIDENCE 2**: 44 Horseshoe Drive, Reynoldsville, PA 15851, hereinafter "**TARGET RESIDENCE 2**," further described in Attachment A-2, for the things described in Attachment B;

**TARGET RESIDENCE 3**: 1602 Salem Road, Dubois, PA 15801, hereinafter "**TARGET RESIDENCE 3**," further described in Attachment A-3, for the things described in Attachment B;

**TARGET RESIDENCE 4**: 221 Van Ness Street, Sykesville, PA 15865, hereinafter "**TARGET RESIDENCE 4**," further described in Attachment A-4, for the things described in Attachment B;

2

**TARGET RESIDENCE 5**: 1957 Clark Road, Olanta, PA 16863, hereinafter "**TARGET RESIDENCE 5**," further described in Attachment A-5, for the things described in Attachment B;

**TARGET RESIDENCE 6**: 232 Seabright Street, Pittsburgh, PA 15214, hereinafter "**TARGET RESIDENCE 6**," further described in Attachment A-6, for the things described in Attachment B;

**TARGET RESIDENCE 7**: 2915 Potomac Avenue, Pittsburgh, PA 15216, hereinafter "**TARGET RESIDENCE 7**," further described in Attachment A-7, for the things described in Attachment B;

**TARGET RESIDENCE 8**: 2805 Custer Avenue, Pittsburgh, PA 15227, hereinafter "**TARGET RESIDENCE 8**," further described in Attachment A-8, for the things described in Attachment B; and

**TARGET RESIDENCE 9**: 3582 Route 219, Brockway, PA 15824, hereinafter "**TARGET RESIDENCE 9**," further described in Attachment A-9, for the things described in Attachment B, and collectively referred to as the **TARGET RESIDENCES**.

2.     In addition to being deputized by the DEA, I am a detective with the City of Pittsburgh Police Department.  I have been a law enforcement officer for the past 21 years.  During my employment and tenure as a law enforcement officer, I have participated in numerous investigations into the unlawful possession and distribution of controlled substances, including cocaine, heroin, methamphetamine, and marijuana, in violation of Title 21 of the United States Code.  These investigations have involved the use of confidential sources, physical surveillance,

electronic surveillance, pen register and toll analysis, and Title III intercepted wire and electronic communications.

3.      I have been a Pittsburgh police officer since September 2000.  As a Pittsburgh police officer, I was assigned to patrol and investigate criminal offenses occurring within Zone 5, which covers the eastern neighborhoods of the City of Pittsburgh, including Homewood and the surrounding neighborhoods.  As a Pittsburgh police officer, I have arrested hundreds of individuals for illegally possessing and/or trafficking in controlled substances as well as the criminal possession/use of firearms.  I was also assigned to the Pittsburgh Police Street Response Unit in 2005, where I made numerous arrests of individuals for illegally possessing and trafficking in controlled substances as well as the criminal possession/use of firearms.  In May 2006, I was assigned to the Allegheny County Violent Crimes and Firearms Task Force.  As a result, I was part of numerous long-term investigations of the illegal trafficking of controlled substances, which included personally engaging in the undercover purchase of various controlled substances.  I conducted several hundred hours of surveillance during these drug-trafficking investigations.

4.      I have been involved in many narcotics-related arrests and the service of many narcotics-related search warrants.  I have handled cooperating sources of information who were involved in narcotics acquisition and/or trafficking.  In addition, I have reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations, and I have had hundreds of conversations with drug traffickers and users as well as with other law enforcement officers about the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers.  As a result of my narcotics-related training and experience, I am

4

familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

5.     The facts and information contained in this affidavit are based upon my personal participation in this investigation and information provided by other law enforcement officers involved in this investigation.  Your Affiant has not submitted each and every fact known to him about the case, just those that he believes establishes probable cause.

6.     In a substantial number of residential searches executed in connection with the drug investigations in which I and fellow Agents and other investigators have been involved, the following kinds of drug-related evidence have typically been recovered from the residences of drug-traffickers:

a.     Controlled substances, such as marijuana, heroin, crack cocaine, powder cocaine, methamphetamine, and synthetic narcotics, such as fentanyl;

b.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, and vitamin B12;

c.     Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

d.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

e.     Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example: money orders, wire transfers (Western Union),

cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

   f. Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, telephone bills and rental car agreements;

   g. Mobile electronic communication devices, such as cellular telephones and "smart phones", electronic messaging equipment, such as tablets, pagers, telephones answering machines, and their tapes, electronic storage devices, such as GPS devices and portable media players, and other such mobile electronic devices that store data, as well as the content therein;

   h. Firearms and other dangerous weapons; and

   i. Photographs, in particular, photographs of co-conspirators, assets, and/or drugs.

  7. In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in the residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, utility and telephone bills, statements, identification documents, and keys to safe deposit boxes and storage facilities.

  8. Based upon my training and experience, as well as the knowledge and experience of other agents and police officers involved in this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences. Further, it is generally a common practice for drug

traffickers to maintain in their residence(s) and/or their business records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

9.      Based upon my training and experience, I also am aware that it is a generally common practice for traffickers to conceal at their residences and/or their business large sums of money, either the proceeds from drug sales or money to be used to purchase controlled substances. Drug traffickers must maintain on hand the large amounts of United States currency in order to maintain and finance their ongoing narcotics business. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences and/or their business.

10.     Based upon my training and experience, that drug traffickers commonly have in their possession that is on their person, at their residences and/or their business, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.

I also am aware that, typically, drug traffickers possess these firearms and other dangerous weapons to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

11.     Further, I am aware that narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc. are generally maintained where the traffickers have easy and ready access to them, including in their residences, businesses, and automobiles.

12.     Further, I am aware that persons involved in significant drug trafficking, conceal in their residences, businesses, and automobiles, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities.

13.     When drug traffickers amass proceeds from the sale of drugs, drug traffickers often attempt to legitimize these profits, or otherwise conceal them from discovery by law enforcement officers. To accomplish these goals, drug traffickers often use different techniques, including but not limited to foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, the purchase of real estate, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds.

14.     Further, I am aware that drug traffickers commonly maintain books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking

organization.  Drug traffickers also take or cause to be taken photographs of themselves, their associates, their property, and their product usually maintain these photographs in their possession.

15.     Further, I am aware that drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics and the paraphernalia includes, but is not limited to scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution.

16.     In addition, as a result of conversations with Assistant United States Attorneys who have prosecuted drug trafficking cases in federal court, I am aware that courts have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside, even if no drug trafficking was directly observed to occur there. *See United States v. Whitner*, 219 F.3d 289, 297-98 (3d Cir. 2000) (collecting cases); and *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (explaining that, in drug cases, evidence is likely to be found where drug dealers reside).

17.     Further, I am aware that drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers. In so doing, they acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names; and that they maintain such documents as evidence of their false identities in their residences, businesses, and automobiles together with evidence of their true identities.

18.     I have knowledge that drug traffickers commonly conceal their activities from members of the public by transacting their business in a convert manner and frequently conducting their business during the nighttime hours when darkness helps conceal their activities. Moreover,

it is highly unusual for individuals primarily engaged in drug trafficking activities to associate in their businesses or social activities with others not engaged in the same drug trafficking activities.

19. I have knowledge that it is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence and/or their business, for their ready access and to conceal them from law enforcement authorities.

20. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this affidavit, arise from the following:

    a. My own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described;

    b. My involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations;

    c. Discussion with other members of DEA and law enforcement officers, both about the facts of this case in particular and about trafficking in general; and

    d. Other intelligence information provided through law enforcement channels.

21. Since this Affidavit is being submitted for the limited purpose of securing a search warrant for these residences, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of the TARGET OFFENSES are presently located at the **TARGET RESIDENCES**. I have the following additional

information from my participation in the instant investigation and from my conversations with other law enforcement officers involved in this investigation.

## II.    FACTS ESTABLISHING PROBABLE CAUSE

22.    A joint investigation conducted by the Drug Enforcement Administration (DEA), United States Postal Service – Office of Inspector General (USPS-OIG), Pennsylvania State Police (PSP), Homeland Security Investigations ("HSI"), and the United States Postal Inspection Service (USPIS) has revealed the HILLEBRAND Drug Trafficking Organization ("HILLEBRAND DTO") is an organization that is responsible for the trafficking and distribution of large amounts of methamphetamine and marijuana from Oregon/California/Nevada to Pennsylvania through the United States Postal Service ("Postal Service").  The HILLEBRAND DTO also transports narcotics proceeds from the distribution of controlled substances via the Postal Service to the Stockton/Modesto/Manteca, CA area from Pennsylvania.

23.    Your Affiant believes that the head of the Organization in the Western District of Pennsylvania, Derek HILLEBRAND ("HILLEBRAND"), is involved in a conspiracy to distribute narcotics in the Western District of Pennsylvania (and elsewhere).  Based on your Affiant's knowledge of the investigation, your Affiant believes that HILLEBRAND contacts George CHARLAN ("CHARLAN"), and CHARLAN supplies the HILLEBRAND DTO with methamphetamine and marijuana. CHARLAN receives methamphetamine from two different sources, Armando RAZO JR. ("RAZO") and Marco ARMENTA (ARMENTA).  CHARLAN either obtains methamphetamine by having his associate, Christian MALDONADO ("MALDONADO") purchase it from RAZO, or CHARLAN contacts ARMENTA to obtain methamphetamine, which ARMENTA receives from Juan VILLAGRAN ("VILLAGRAN"),

who is supplied by Marco GALVEZ ("GALVEZ").  RAZO or ARMENTA then provide

methamphetamine to MALDONADO, who packages the methamphetamine and arranges for it

to be shipped to the HILLEBRAND DTO in the Western District of Pennsylvania.

24.     During the course of the investigation, which began in July 2020 and is ongoing,

investigators identified narcotics customers, sources of supply, and associates for the

HILLEBRAND DTO.  Specifically, through the interception of telephones utilized by

HILLEBRAND, SCHOENING, ADEKUNLE, MALDONADO, CHARLAN, RAZO,

VILLAGRAN, and ARMENTA, agents identified members of the Organization whose

involvement is relevant to this affidavit.

25.     On August 24, 2021, a federal grand jury sitting in the Western District of

Pennsylvania returned a six-count Indictment arising out of this investigation, which is filed at

Criminal No. 21-355 (W.D.Pa.).

26.     Count One of the Indictment charges that from in and around July 2020, and

continuing thereafter to in and around August 2021, in the Western District of Pennsylvania and

elsewhere, the defendants, DEREK HILLEBRAND, GEORGE CHARLAN, YUSUF

ADEKUNLE, MARCO ARMENTA, SILVIA AYALA, FRANCISCO BARBA, AMY

BORTOT, BRANDON CODER, TERRENCE DOUGHERTY, DARREN DOUGLAS,

MARCO GALVEZ, CHAD GASBARRE, DANIELLE GILLAM, KENNETH GILLAM,

MORGAN GREGORY, DARRYL ISAACS, KRISTY LEPIONKA, CHRISTIAN

MALDONADO, LISANDRA MALDONADO, ABEL PEREZ, JEFFREY PETERS, MEGAN

PYNE, ARMANDO RAZO JR., CHRISTOPHER ROBERTSON, BRENTON RYANS, RYAN

SCHOENING, BRENT SHAFFER, CHRISTINA SHAFFER, MELVIN SHELANDER,

DARNELL SMITH, TAYLOR THOMAS, JUAN VILLAGRAN, JOSE VILLALOBOS,

JAMES WHITE, JAMES WILLIAMS, TRAVIS WILLIAMS, and JUSTIN ZERUTH, did

knowingly, intentionally and unlawfully conspire with one another and with persons both known

and unknown to the grand jury, to possess with intent to distribute and distribute 50 grams or

more of methamphetamine, a Schedule II controlled substance, contrary to the provisions of Title

21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii), 500 grams or more of a

mixture and substance containing a detectable amount of methamphetamine, a Schedule II

controlled substance, contrary to the provisions of Title 21, United States Code, Sections

841(a)(1) and 841(b)(1)(A)(viii), 500 grams or more of a mixture and substance containing a

detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of

Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii), and a quantity of a mixture

and substance containing a detectable amount of marijuana, a Schedule I controlled substance,

contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D),

in violation of Title 21, United States Code, Section 846.

     27.     Additionally, on August 24, 2021, a federal grand jury sitting in the Western

District of Pennsylvania returned a one-count Indictment related to this investigation, which is

filed at Criminal No. 21-354 (W.D.Pa.), charging Doug Austen ("AUSTEN") with Possession

with Intent to Distribute and Distribution of 50 Grams or More of Methamphetamine.

     28.     Additionally, on August 24, 2021, a federal grand jury sitting in the Western

District of Pennsylvania returned a two-count Indictment related to this investigation, which is

filed at Criminal No. 21-358 (W.D.Pa.), charging DIEGO ZAMUDIO, KIMARI JACKSON, TERRY KELLY, KAREEM ROCK, RYAN SCHOENING, and JASON WHITAKER with Conspiracy to Possess with Intent to Distribute and Distribute of 500 Grams or More of Methamphetamine at Count One and KIMARI JACKSON and KAREEM ROCK with Possession with Intent to Distribute 500 Grams or More of Methamphetamine, 50 Grams or More of Methamphetamine, and 40 Grams or More of Fentanyl at Count Two.

29.     Additionally, on August 24, 2021, a federal grand jury sitting in the Western District of Pennsylvania returned a two-count Indictment related to this investigation, which is filed at Criminal No. 21-353 (W.D.Pa.), charging YUSUF ADEKUNLE, ADRIAN ALVAREZ, and JESUS GONZALEZ with Conspiracy to Possess with Intent to Distribute and Distribute Five Kilograms or More of Cocaine at Count One and Possession with Intent to Distribute Five Kilograms or More of Cocaine at Count Two.

30.     The **TARGET RESIDENCES** that this affidavit seeks to search, described more fully in Attachment A, and believed to be associated with the following person(s):

**TARGET RESIDENCE 1**: 41 Horseshoe Drive, Reynoldsville, PA 15851, which is the residence of Kristy LEPIONKA ("LEPIONKA") and Brenton RYANS ("RYANS");

**TARGET RESIDENCE 2**: 44 Horseshoe Drive, Reynoldsville, PA 15851, which is the stash location for the main target of the investigation, HILLEBRAND and where he occasionally stays;

**TARGET RESIDENCE 3**: 1602 Salem Road, Dubois, PA 15801, is HILLEBRAND's girlfriend's residence and where he frequently stays;

**TARGET RESIDENCE 4**: 221 Van Ness Street, Sykesville, PA 15865, which is the current address of Brandon CODER, a known associate of HILLEBRAND ("CODER");

**TARGET RESIDENCE 5**:  1957 Clark Road, Olanta, PA 16863, which is the address of Brent SHAFFER, a known associate of HILLEBRAND ("B. SHAFFER");

**TARGET RESIDENCE 6**: 232 Seabright Street, Pittsburgh, PA 15214, is associated with Darnell SMITH ("SMITH"), who is an associate of HILLEBRAND and HILLEBRAND's source of supply, George CHARLAN.

**TARGET RESIDENCE 7**: 2915 Potomac Avenue, Pittsburgh, PA 15216, is associated with Terrence DOUGHERTY ("DOUGHERTY"), who purchases methamphetamine from CHARLAN.

**TARGET RESIDENCE 8**: 2805 Custer Avenue, Pittsburgh, PA 15227, is associated with Doug AUSTEN ("AUSTEN"), who is an associate of DOUGHERTY.

**TARGET RESIDENCE 9**: 3582 Route 219, Brockway, PA 15824, is associated with Chad GASBARRE ("GASBARRE"), who is an associate of Ryan SHOENING ("SHOENING"), Jason WHITAKER ("WHITAKER"), and Terry KELLY ("KELLY").

## BACKGROUND OF INVESTIGATION

31.     In July of 2020, HILLEBRAND was arrested for a parole violation because he was in possession of drug paraphernalia, and "owe sheet," and a large amount of cash. HILLEBRAND contacted the local district attorney's office offering to provide information about drug trafficking in the counties of Clearfield and Jefferson, and your Affiant was contacted by the local investigators.  Your Affiant began obtaining information from HILLEBRAND about other drug dealers.  Your Affiant believes that HILLEBRAND has provided accurate

information; however, your Affiant believes that HILLEBRAND minimized or excluded his own involvement in drug activities.

32.     In relation to DEA's investigation of the Organization, the DEA was able to successfully utilize HILLEBRAND as a Confidential Source to provide detailed information about the Organization and the Organization's drug trafficking operations.  In the course of HILLEBRAND's cooperation, he has provided information about SCHOENING, SMITH, Yusuf ADEKUNLE ("ADEKUNLE"), and others involved in the Organization.  During the course of the investigation, however, it was determined that HILLEBRAND was continuing to engage in the trafficking of large amounts of methamphetamine, cocaine, and marijuana in conjunction with SCHOENING, D. SMITH, ADEKUNLE, and other members of the Organization.

33.     Investigators became aware of HILLEBRAND's continued illegal activities soon after HILLEBRAND began providing investigators with information, and investigators quickly determined that HILLEBRAND was providing investigators with information pertinent to the drug trafficking activities of the Organization while omitting his own involvement.  However, investigators continued to communicate with HILLEBRAND, and investigators were able to independently corroborate the information provided by HILLEBRAND.  This corroboration included the interdiction of a parcel containing 2.2 kilograms of pure methamphetamine on September 13, 2020 that was shipped to 2238 Belsena Rd., Madera, Pennsylvania, from California; the seizure of six kilograms of cocaine on October 22, 2020 from a private plane at Pittsburgh International Airport; and the seizure of 10.6 kilograms of pure methamphetamine on April 21, 2021 that was transported by vehicle from Houston, Texas to Clearfield County, Pennsylvania, all three of which are described in detail below.

34.     Without any assistance from HILLEBRAND, in August 2020, investigators became aware that multiple parcels of suspected methamphetamine were being mailed from California to various locations in Pennsylvania counties of Clearfield and Jefferson. Investigators observed HILLEBRAND personally receive several of these suspected methamphetamine packages.  As described below, during the course of this investigation, HILLEBRAND has been identified as a large-scale distributor of methamphetamine, cocaine, marijuana, and other substances throughout the Pennsylvania counties of Allegheny, Beaver, Elk, Jefferson, and Clearfield.

35.     On August 25, 2020, investigators received information from Confidential Source 5[1] ("CS5") regarding HILLEBRAND.  CS5 informed investigators that CS5 had recently had a conversation with HILLEBRAND, during which HILLEBRAND revealed to CS5 that HILLEBRAND took back control of the Organization from SCHOENING.

36.     HILLEBRAND was intercepted between November of 2020 and May 2021, discussing his drug distribution business, including ordering bulk amounts of methamphetamine, cocaine, and marijuana and distributing those narcotics to members of his Organization.  Through intercepted communications, Investigators believe that HILLEBRAND ordered over 100 kilograms of methamphetamine and 1,000 kilograms of marijuana from George CHARLAN, who

---

1 CS5 was referred to as CS5 throughout the wiretap affidavits written during the course of this investigation.  He/she will be referred to as CS5 throughout this affidavit for consistency.  CS5 is currently on probation with Clearfield County for a conviction for misdemeanor disorderly conduct.  CS5 agreed to be debriefed relative to her/his involvement in the illegal distribution of drugs in an attempt to receive leniency with respect to violations of his/her conditions of probation.  CS5 has convictions for misdemeanor harassment and theft.  CS5 has provided information throughout this investigation.

resides in Oregon, including approximately 10 kilograms of methamphetamine that was seized. The interceptions have revealed numerous associates of HILLEBRAND in Western Pennsylvania. Further, through the information collected from the interceptions, your Affiant identified Christian MALDONADO, CHARLAN's associate who resides in California, and several methamphetamine suppliers that also reside in California, all of whom were intercepted during the investigation.

## **WIRETAP INFORMATION**

37.     As the investigation progressed, your Affiant applied for multiple Title III wire and electronic interceptions of HILLEBRAND and associates, co-conspirators, and sources of supply.  The interceptions have been combined with physical surveillance, other investigative methods, and have identified members of the Organization and the modus operandi of the Organization.

38.     On November 24, 2020, your Affiant applied for and obtained the initial Title III wire and electronics interception of two phones used by HILLEBRAND, which was read and approved by Chief Judge Mark R. Hornak, at Magistrate Number 20-1594.  HILLEBRAND is the main target of the investigation.  HILLEBRAND has resided at **TARGET RESIDENCE 2** and still uses it as a stash location, which will be described in detail below.  Further, HILLEBRAND is known to frequently reside at **TARGET RESIDENCE 3**, with his girlfriend, as set forth below.

39.     Since the initial interceptions, your Affiant has applied for additional interceptions of HILLEBRAND and other co-conspirators and sources of supply.  The second round of interceptions was signed on December 22, 2020, at Magistrate Number 20-1594(a), by Chief Justice Hornak.  This affidavit allowed for the continued interceptions of HILLEBRAND.

40.     The third round of interceptions was signed on January 27, 2021, at Magistrate Number 20-1594(b), by Chief Justice Hornak. This affidavit allowed for the continued interceptions of HILLEBRAND, in addition to the interceptions of George CHARLAN, the source of supply of methamphetamine and marijuana, and associates and co-conspirators: ADEKUNLE, and SCHOENING.

41.     Your Affiant has applied for additional rounds of interceptions of the sources of supply and other co-conspirators operating in California of the United States.  Your Affiant is currently intercepting three phones used by VILLAGRAN and one phone used by ARMENTA,. These applications were read and approved by Chief Magistrate Judge Hornak at Magistrate No. 20-1594(h).  This was signed on August 12, 2021, and the phone used by ARMENTA was signed in an amended affidavit on August 17, 2021.

### TARGET RESIDENCES 1, 2, and 3

42.     Your Affiant is aware that **TARGET RESIDENCE 1** is located across the street from **TARGET RESIDENCE 2** and the residents of **TARGET RESIDENCE 1**, Kristy LEPIONKA and Brenton RYANS, are close associates of HILLEBRAND.  For example, in an intercepted call on December 2, 2020, LEPIONKA told HILLEBRAND that she would "run across the street".   Your Affiant believes that LEPIONKA is fully aware of the operation, and she serves as an assistant to HILLEBRAND.  Multiple intercepted calls reveal that LEPIONKA provided methamphetamine to HILLEBRAND's distributors when HILLEBRAND was unavailable.  LEPIONKA also obtains boxes from the post office that HILLEBRAND uses to package drug payments.  LEPIONKA then takes the parcels to the post office and mails the parcels containing drug proceeds to California for HILLEBRAND.

19

43. On September 3, 2020, at approximately 9:41 AM, investigators traveled to **TARGET RESIDENCE 1** to conduct physical surveillance of the delivery of a parcel suspected to contain methamphetamine at that location, which they were notified about by United States Postal Service Office of the Inspector General (USPS-OIG) Special Agent (SA) Adam Gaab. Investigators were notified prior to arriving at the location that the parcel had already been delivered.  Investigators continued to that address to conduct surveillance and observed a black Volvo leave **TARGET RESIDENCE 1**.  Investigators followed the black Volvo but eventually lost sight of the vehicle as it was traveling towards the town of Big Run, Pennsylvania.

44.     At approximately 11:30 AM on that date, Investigators had a scheduled meeting with HILLEBRAND in Luthersburg, PA, for HILLEBRAND to brief your Affiant on updates as part of HILLEBRAND's cooperation.  HILLEBRAND arrived at the meeting in a black Volvo with a temporary paper tag in the rear window and no license plate, which matched the description of the black Volvo observed leaving **TARGET RESIDENCE 1** and driving towards Luthersburg, PA, fifteen minutes earlier.  Investigators meeting with HILLEBRAND took a photo of the black Volvo and sent it to the PSP Troopers who conducted surveillance.  The PSP Troopers confirmed that the vehicle that HILLEBRAND drove to the meeting with investigators was the same vehicle that was observed leaving **TARGET RESIDENCE 1** earlier that morning.

45.     Investigators learned through USPS tracking that two additional parcels shipped from California were scheduled to be delivered to the area of Jefferson County and Clearfield County around 9:30 AM on September 23, 2020.  The first package, associated with tracking number 9505 5150 4241 0265 3803 00, was sent to **TARGET RESIDENCE 2**.  The second package, associated with tracking number 9505 5159 1761 0265 3562 50, was shipped to 1957

Clark Road, Olanta, PA, 16863.  This address is in very close proximity to TARGET

RESIDENCE 5 and is occupied by B. SHAFFER's parents.

46.     Beginning at 9:00 AM, on September 23, 2020, investigators, utilizing National

Guard Counter Drug aerial support, conducted aerial surveillance in the area of **TARGET**

**RESIDENCE 2**.  Investigators observed HILLEBRAND's black Volvo parked in the yard next

to **TARGET RESIDENCE 2**.  After approximately 40 minutes, the black Volvo was driven

from the yard and parked across the street from **TARGET RESIDENCE 2**.  HILLEBRAND

then exited the vehicle and walked across the street to **TARGET RESIDENCE**

**2**.  HILLEBRAND returned to his vehicle and left the area.  Ground surveillance units

remained in the area of **TARGET RESIDENCE 2** while aerial surveillance and PSP Troopers

followed HILLEBRAND.

47.     HILLEBRAND then drove to 1957 Clark Road, Olanta, PA, where he arrived

around 10:42 AM. HILLEBRAND exited his vehicle and walked into the

residence.  Approximately five minutes later, HILLEBRAND exited the residence with an

unknown white male.  HILLEBRAND and the other male walked to HILLEBRAND's black

Volvo, retrieved an empty black bag from the trunk of his vehicle, and re-entered the residence,

carrying the black bag.  Approximately 40 minutes later, HILLEBRAND exited the residence

with the unknown white male carrying the same black bag that now appeared to be weighted

down with an unknown object.  HILLEBRAND placed the black bag in his trunk and drove

away from the residence.

48.     On October 22, 2020, your Affiant was contacted by HILLEBRAND, who stated

there may be a load of drugs coming into Pittsburgh on a private plane from Houston, TX.

21

Investigators discovered that HILLEBRAND was correct: they learned that there was a private plane chartered out of Houston, destined for Pittsburgh International Airport later that night. Investigators conducted an interdiction of the plane and passengers, including Yusuf ADEKUNLE and three other subjects from the Houston, TX area, and ultimately executed a Federal search warrant at on the plane at Magistrate Number 20-2138, which was read and approved by US Magistrate Judge Patricia Dodge.  During a search of passenger luggage, six kilograms of cocaine was located and seized.

49.     Your Affiant spoke with HILLEBRAND and realized that HILLEBRAND had not thought that investigators would interdict the drugs.  Your Affiant believes that HILLEBRAND was intended to receive a portion of the cocaine for distribution in Western PA, and thought that by alerting your Affiant, would absolve him of involvement.

50.     On December 3, 2020, at approximately 12:16 PM, based on information from the wire, a call was intercepted between Darren DOUGLAS ("DOUGLAS") and HILLEBRAND. DOUGLAS, who was determined to be a methamphetamine distributor who purchased large quantities of methamphetamine from HILLEBRAND for redistribution, stated to HILLEBRAND he had "6." HILLEBRAND advised DOUGLAS to take the item to LEPIONKA.  On December 3, 2020, a gray Chevrolet Malibu with black rims, was observed parked across from **TARGET RESIDENCE 1**.  Investigators are aware that DOUGLAS drives a gray Chevrolet Malibu with black rims based on previous surveillance.  Later that day, at approximately 1:14 PM, DOUGLAS was observed arriving at his residence in the same gray Chevrolet Malibu with black rims that was observed parked across from **TARGET RESIDENCE 1**.  Your Affiant believes that DOUGLAS took the "6" to LEPIONKA at **TARGET RESIDENCE 1**.

51.     On December 3, 2020, at 12:58 PM, HILLEBRAND, utilizing 470-330-0246 (which is identified in the wire affidavits as "TARGET TELEPHONE 1"), sent an outgoing text message to (the source of supply) CHARLAN, using 209-401-5074, (which is identified in the wire affidavits as "TARGET TELEPHONE 4") stating, "41 horseshoe drive Reynoldsville, pa 15851", followed by a second text that stated, "That's for cream put mike august".  Your Affiant, based on training, experience and knowledge of this investigation, believes that HILLEBRAND instructed CHARLAN to send the 10 pounds of methamphetamine via USPS to "Mike August" at **TARGET RESIDENCE 1**.

52.     On December 7, 2020, SA Gaab identified a suspicious USPS Priority Mail parcel that was sent from Reno, NV on December 4, 2020, and delivered to **TARGET RESIDENCE 1** on December 7, 2020.  The parcel, which was addressed to "Mike August", was associated with tracking number 9505 5100 6012 0339 1908 10 and weighed 16 pounds and 1 ounce.  As set forth above, I am aware that on December 3, 2020, HILLEBRAND advised CHARLAN to send a shipment of methamphetamine to **TARGET RESIDENCE 1**.  Based on my training and experience and knowledge of this investigation, I believe that parcel contained ten pounds of methamphetamine.

53.     As investigators identified the significance of **TARGET RESIDENCES 1** and **2,** as locations of interest in this investigation, a pole camera was installed on December 22, 2020, to allow investigators to observe those locations. The camera has been extremely helpful in identifying individuals as they come to the garage.  The camera has also allowed Investigators to determine the roles played by SCHOENING, C. SHAFFER and LEPIONKA in the Organization.

From December 22, 2020 through the present, HILLEBRAND, LEPIONKA, and numerous members of the Organization have been observed at **TARGET RESIDENCES 1** and **2.**

54.     On December 26, 2020, CODER was seen via surveillance on the pole camera arriving at **TARGET RESIDENCE 2**, exiting his vehicle, and retrieving a large box from his trunk.   CODER proceeded to take the box into **TARGET RESIDENCE 2**.  At 2:48 PM, HILLEBRAND was observed outside of **TARGET RESIDENCE 2** talking on his phone, before going back into **TARGET RESIDENCE 2**.  At 3:55 PM, HILLEBRAND exited **TARGET RESIDENCE 2**, got into his black Volvo, and drove away.  At the same time, CODER got into the silver sedan along with a female passenger and left.

55.     On December 27, 2020, at approximately 4:50 PM, HILLEBRAND, utilizing TARGET TELEPHONE 3, received an incoming call from the source of supply, CHARLAN, utilizing TARGET TELEPHONE 4.  HILLEBRAND and CHARLAN discussed HILLEBRAND acquiring drugs and HILLEBRAND owing CHARLAN money for those drugs.  In an excerpt from that conversation, HILLEBRAND told CHARLAN, "No, listen. You're gonna have, you're gonna get [U/I] more than 100 back because I haven't even collected from fucking anybody big. This is all my small people up here. I'm waiting on the fucking... I got another 25 coming from fucking Johnstown right now."   Based on my training and experience and knowledge of this investigation, I believe that HILLEBRAND is telling CHARLAN that he is still collecting drug debts from his customers in order to pay CHARLAN.

56.     On January 31, 2021, at approximately 9:10 AM, wiretap interceptions revealed that HILLEBRAND was on his way to Pittsburgh.  Around the same time, interceptions revealed

that B. SHAFFER was going to drop off $6,300 to SCHOENING.   A short time later, HILLEBRAND directed B. SHAFFER to go to **TARGET RESIDENCE 2**.

57.    At approximately 10:40 AM a light blue Chevrolet SUV was observed pulling into **TARGET RESIDENCE 2**.  A white male was observed to get out of the SUV and entering the garage area of **TARGET RESIDENCE 2**.  At approximately 10:52 AM, a white male came back out of the garage and walked back over to the SUV.  That individual and another white male then exited the SUV and entered the garage.   While the two individuals were inside the garage, HILLEBRAND was in contact with B. SHAFFER, who told HILLEBRAND that he was looking for a scale.  At approximately 11:22 AM, observed on the pole camera the two white males leaving the garage and getting into the light blue SUV and leave the property.

58.    On February 3, 2021, based on interceptions, HILLEBRAND had been in contact with B. SHAFFER.   B. SHAFFER was to come to **TARGET RESIDENCE 2** to pick up a "pound" and deliver money.  At approximately 4:35 PM, a silver Chevrolet Equinox was observed, on the pole camera, arriving at **TARGET RESIDENCE 2**.  B. SHAFFER was observed exiting the front passenger's seat of the Equinox carrying a small black bag.  B. SHAFFER went inside the garage and remained until 5:02 PM when he reentered the Equinox and departed.  Based on surveillance and the interceptions from the wire, your Affiant believes that B. SHAFFER delivered money to HILLEBRAND at **TARGET RESIDENCE 2** and also picked up a pound of methamphetamine.

59.    On February 12, 2021, based on information from the wire, Christina SHAFFER ("C. SHAFFER") (no known relation to Brent SHAFFER), reached out to SCHOENING requesting to get some more methamphetamine.  Based on information from the wire,

25

SCHOENING advised C. SHAFFER he would leave the drugs with Kristy LEPIONKA.  On

February 12, SCHOENING reached out to LEPIONKA, and told her there is a bag by the bikes

that contains an ounce for C. SHAFFER.

60.    Later, on February 12, 2021, at 1:57 PM, C. SHAFFER was observed via pole

camera driving into **TARGET RESIDENCE 2**.  C. SHAFFER was operating a Dodge Durango,

which she had been previously observed driving.  C. SHAFFER was observed exiting her vehicle

and, walking across the street to **TARGET RESIDENCE 1**, and entering the residence.  On

February 12, 2021 at 2:09 PM, Tpr. Howell observed a gray in color Jeep SUV pull up beside

**TARGET RESIDENCE 1**.  Tpr. Howell observed LEPIONKA exit the driver side of the

vehicle, and also an unknown female exit the passenger side.  Both females then continued to

enter **TARGET RESIDENCE 1**.  On February 12, 2021 at 2:13 PM, Tpr. Howell observed

SHAFFER, LEPIONKA, and the unknown female exit **TARGET RESIDENCE 1**, and all three

females then proceeded to walk across the street to **TARGET RESIDENCE 2** and enter the

garage.  On February 12, at 2:21 PM, Tpr. Howell observed C. SHAFFER exit the garage of

**TARGET RESIDENCE 2**, get back into her vehicle and leave the residence.

61.    Investigators obtained evidence from intercepted communications that

LEPIONKA assists HILLEBRAND by retrieving parcels containing narcotics and delivering

parcels containing U.S. Currency to various post offices.

62.    Throughout the course of the wire and according to USPS database records, at least

25 parcels containing monetary proceeds are known to be linked to HILLEBRAND and shipped

to associates in California for the payment of narcotics.  Approximately $1.2 million were sent

by HILLEBRAND and his associates from January 1, 2021, through April 29, 2021.  Your

Affiant is aware of this amount due to the contents of intercepted conversations and a review of parcels that were shipped from Pennsylvania to the Stockton, California area.

63.     According to USPS records, from August 21, 2020, through June 10, 2021, nine parcels suspected to contain narcotics were shipped to **TARGET RESIDENCE 1**.  Of those nine, eight parcels contained over ninety pounds of methamphetamine, including a suspected parcel of over 15 pounds of methamphetamine.  One parcel contained over 15 pounds of marijuana.  Your Affiant is aware that these amounts are known or suspected due to the content of intercepted conversations.  As explained in greater detail below, this residence is associated with LEPIONKA.

64.     According to USPS records, from September 1, 2020, through November 14, 2020, seven parcels suspected to contain narcotics were shipped to **TARGET RESIDENCE 2**. Of those seven, five parcels contained nearly 30 pounds of methamphetamine.  Two parcels contained over 30 pounds of marijuana.  Your Affiant is aware that these amounts are known or suspected due to the contents of intercepted conversations.  As explained in greater detail below, this residence is associated to HILLEBRAND.

65.     On June 9, 2021, Tpr. Howell was conducting surveillance based on previously received information from SA Gaab that a suspected methamphetamine-filled parcel would be delivered to 291 Wishaw Road that day.  At approximately 10:00 AM, Tpr. Howell drove by **TARGET RESIDENCE 3** and observed HILLEBRAND's black Volvo sedan with red rims present at the residence.  Later on that date, Tpr. Rupp was in a stationary position near 291 Wishaw Road.  Tpr. Rupp observed HILLEBRAND's black in color Volvo sedan with red rims traveling south on SR 310 go past his location on Wishaw Road.  Due to the remote location of

the residence on Wishaw Road, and the chance of being detected, Tpr. Rupp did not follow

HILLEBRAND.  Less than one hour later, on June 9, 2021, Tpr. Needham drove past **TARGET**

**RESIDENCE 3** and observed HILLEBRAND's black Volvo with red rims to be present at the

residence.

66.     Later on June 9, 2021, at approximately 1:38 PM, Tpr. Howell passed

HILLEBRAND operating the black Volvo with red rims.  Then at approximately 1:47 PM, while

remotely monitoring the pole camera, Tpr. Howell observed HILLEBRAND pull into **TARGET**

**RESIDENCE 2**.  Tpr. Howell observed HILLEBRAND exit the vehicle, open the rear driver's

side door and retrieve something.  As HILLEBRAND walked toward the door to enter

**TARGET RESIDENCE 2,** Tpr. Howell observed him carrying a gray in color bag, which

appeared to be weighted.  Tpr. Howell knows from previous surveillance that when

HILLEBRAND retrieves a package containing narcotics he will conceal the package.  Tpr.

Howell believes that HILLEBRAND retrieved the package of suspected methamphetamine from

291 Wishaw Road, and then proceeded to take it to his stash house, at **TARGET RESIDENCE**

**2.**

67.     On August 10, 2021, PSP Tpr. Howell, while conducting surveillance of **TARGET**

**RESIDENCES 1** and **2** remotely via the pole camera, observed a UPS truck pull up to **TARGET**

**RESIDENCE 1**.  At approximately 1:38 PM, Tpr. Howell observed the UPS driver, deliver a

brown box to **TARGET RESIDENCE 1**.  The driver returned to the truck and proceeded to leave

**TARGET RESIDENCE 1**.  Later, on August 10, 2021, at approximately 1:40 PM, Tpr. Howell

observed Brenton RYANS, an associate of HILLEBRAND, exit **TARGET RESIDENCE 1**

carrying two brown boxes.  Tpr. Howell observed RYANS walk across the street to **TARGET**

**RESIDENCE 2** and enter **TARGET RESIDENCE 2**.  Approximately 30 seconds later, Tpr. Howell observed RYANS exit **TARGET RESIDENCE 2** and was no longer in possession of any boxes.  RYANS then walked back over to **TARGET RESIDENCE 1**.  Your Affiant is aware that this is consistent with the methamphetamine and marijuana filled parcels.

68.    HILLEBRAND is no longer being intercepted and was last intercepted in May 2021, through the wiretap of CHARLAN's phone.  Further, CHARLAN is no longer being intercepted, but CHARLAN's source of supply, ARMENTA is currently being intercepted and most recently spoke with CHARLAN on August 21, 2021.  Toll analysis reveals that HILLEBRAND is currently still speaking with CHARLAN.

69.    Through toll record data obtained from T-Mobile, I am aware that from July 22, 2021, to August 14, 2021, there were approximately 73 contacts between HILLEBRAND, utilizing 814-699-2932, and Brenton RYANS, utilizing 814-590-2648.

70.    This toll record analysis from July 22, 2021 to August 14, 2021, reveals toll record patterns consistent with toll records observed during wiretap interceptions that revealed methamphetamine and marijuana distribution.   Based upon this continued pattern of communication, there is a reasonable basis to believe that this continued communication pertains to the ongoing distribution of methamphetamine and marijuana.

71.    On August 17, 2021, HSI SA Brianna Coleman conducted searches of the commercially available database Accurint.  SA Coleman found that **TARGET RESIDENCE 1** is currently associated with Kristy LEPIONKA.

72.    Also on August 17, 2021, SA Coleman conducted queries of the Pennsylvania Justice Network (JNet) and located a Pennsylvania Driver's License for LEPIONKA that was

recently issued on July 13, 2021.  LEPIONKA's license carries the address of **TARGET RESIDENCE 1.**

73.     Your Affiant is aware that HILLEBRAND, as explained above and recently observed on the pole camera, still frequents **TARGET RESIDENCE 2.**  Further, your Affiant is aware that HILLEBRAND frequently resides at **TARGET RESIDENCE 3** with his girlfriend.

74.     On August 17, 2021, HSI SA Brianna Coleman conducted searches of the commercially available database Accurint.  SA Coleman found that **TARGET RESIDENCE 1** is currently associated with Kristy LEPIONKA.

75.     Later, on August 17, 2021, SA Coleman queried the criminal histories of the subjects associated with the **TARGET RESIDENCES.**  Kristy LEPIONKA appears to be a convicted felon, from a case on or about October 25, 2015, at docket number: CP-45-CR-0002563-2015, for possession of a manufacturing of a controlled substance, receiving stolen property, possession of a controlled substance, firearm not to be carried without a license, by the Pennsylvania State Police.  LEPIONKA plead guilty to manufacture of a controlled substance and firearm not to be carried without a license.  LEPIONKA also has an arrest from 2011, including pleading guilty to two counts of use of drug paraphernalia on or about April 28, 2011.  Then, on or about November 17, 2018, LEPIONKA pleaded guilty to possession of a controlled substance and use of drug paraphernalia.  Further, LEPIONKA was listed at **TARGET RESIDENCE 1** from her most recent arrest in 2019.

76.     HILLEBRAND also appears to be a convicted felon from an arrest on January 5, 2015, where he pleaded guilty to manufacture of a controlled substance, at Docket number: CP-33-CR-0000346-2016, by the Pennsylvania State Police.  HILLEBRAND has multiple drug

related arrests, including pleading guilty to a DUI on or about April 17, 2015.  HILLEBRAND

also pleaded guilty to possession of drug paraphernalia on or about April 30, 2016.

77.     On August 23, 2021, SA Coleman reviewed Brenton RYANS' criminal history.

RYANS has arrests starting in 2006, mainly for drug charges.  On or about February 21, 2006,

RYANS was arrested for possession of a controlled substance and pleaded guilty to a

misdemeanor charge.  On or about May 12, 2014, RYANS was arrested for a DUI and pleaded

guilty.  On or about July 27, 2019, RYANS was arrested for use of drug paraphernalia,

possession of a controlled substance, DUI and pleaded guilty.

78.     On August 16, 2021, HILLEBRAND spoke with your Affiant and said that PA

State Parole had scheduled to go to his house early the following morning.  Your Affiant knows

that HILLEBRAND is referring to his mother's address, which is the address on file for

HILLEBRAND with Parole.

79.     The next morning, on August 17, 2021, HILLEBRAND told your Affiant that he

had overslept and was late getting to that address to meet his parole officer.  Tpr. Howell went

back and checked the pole camera at Horseshoe on the morning of August 17, 2021, to see if

HILLEBRAND had spent the night and did not see HILLEBRAND's car parked there.  Your

Affiant believes therefore that HILLEBRAND had stayed at **TARGET RESIDENCE 3**.

80.     On August 20, 2021, Tpr. Howell conducting surveillance of the pole camera,

observed LEPIONKA's vehicle parked at **TARGET RESIDENCE 1**.

81.     On August 22, 2021, Tpr. Howell conducting surveillance of the pole camera,

observed HILLEBRAND at **TARGET RESIDENCE 2** in a white sedan with what appears to be

an out-of-state plate.  At approximately 12:04 PM, Tpr. Howell positively identified

HILLEBRAND exit the vehicle.  Tpr. Howell observed HILLEBRAND walk into **TARGET RESIDENCE 2**, hands empty.  At approximately 12:56 PM, Tpr. Howell observed HILLEBRAND exit **TARGET RESIDENCE 2**, carrying a black book bag.  Tpr. Howell observed HILLEBRAND place the book bag in the back right seat of the sedan.  HILLEBRAND then got into the driver seat of the white sedan and left **TARGET RESIDENCE 2.**

82.     On August 24, 2021, Tpr. Howell was conducting surveillance in the area of **TARGET RESIDENCE 3** and observed the same white sedan parked at **TARGET RESIDENCE 3** as he had seen a few days earlier at **TARGET RESIDENCE 2**, and knew HILLEBRAND to drive.

83.     On August 25, 2021, Tpr. Howell drove by **TARGET RESIDENCE 3** again and saw the same white sedan that he knows HILLEBRAND to drive.  Further, the Ping data showed the phone used by HILLEBRAND to be in the area of **TARGET RESIDENCE 3.**  Later on August 25, 2021, Tpr. Howell was conducting remote surveillance of the pole camera and saw HILLEBRAND at **TARGET RESIDENCE 2.**

84.     HILLEBRAND has asked your Affiant several times if HILLEBRAND would be able to get approval from a Judge to move somewhere with his girlfriend.  Based upon this fact and the frequency of other observations of HILLEBRAND at **TARGET RESIDENCE 3**, your Affiant has reason to believe that on most nights, HILLEBRAND stays at **TARGET RESIDENCE 3**.  Although drug trafficking was not directly observed to occur at **TARGET RESIDENCE 3**, as the courts have recognized with respect to drug dealers' residences, because HILLEBRAND is frequently staying at **TARGET RESIDENCE 3** and treating it as his residence, evidence of his involvement in the drug trade is likely to be found there.

85.     On August 26, 2021, HILLEBRAND was observed again at **TARGET RESIDENCE 2**, per surveillance using the pole camera.

**TARGET RESIDENCE 4**

86.     Investigators are aware that Brandon CODER is associated with **TARGET RESIDENCE 4.**  CODER is an associate of HILLEBRAND.

87.     Investigators learned through USPS tracking that a package, associated with tracking number 9505 5100 4177 0291 5121 41, was shipped from Reno, Nevada to **TARGET RESIDENCE 4** and was scheduled to be delivered at approximately 3:30 pm on October 21, 2020.  At 3:38 pm on October 21, 2020, Investigators utilized National Guard Counter Drug aerial support, to conduct aerial surveillance in the area of **TARGET RESIDENCE 4**.  Investigators observed Derek HILLEBRAND's black Volvo parked in the driveway of **TARGET RESIDENCE 4**.  At 3:41 pm, the USPS postal carrier arrived at the residence and walked to the front passenger door of the black Volvo.  HILLEBRAND received the package from the postal carrier[2] and placed the package in the trunk of the black Volvo.  HILLEBRAND then grabbed a blue towel from the backyard of **TARGET RESIDENCE 4**, carried the towel to his trunk, manipulated the package for several minutes before closing his trunk, then drove away from the area.

88.     On November 27, 2020, CODER was intercepted texting HILLEBRAND at approximately 9:25 PM.  CODER wrote, "I don't have the money yet tho just saying I will get it in 2 days I have people blowing mre [sic] up and I got a dude that wants 2 zips of green".  Your

---

[2] Later identified as Amy BORTOT.

33

Affiant understands that text to mean that CODER owes HILLEBRAND money, but does not have it yet.  Your Affiant also believes that CODER told HILLEBRAND that CODER wants to sell marijuana.  Based on other interceptions, your Affiant is aware that CODER purchases methamphetamine and marijuana from HILLEBRAND.

89.     CODER has been intercepted numerous times talking with HILLEBRAND.  On February 2, 2021, starting at approximately 12:55, CODER (BC) and HILLEBRAND (DH) discuss an incoming parcel.  Below is an excerpt from their intercepted call is below:

> DH:   Hey, nothing. Would you uh, wanna make a little extra money today with that box?
> BC:   Yeah, wh-, what do you need?
> DH:   You, I mean... It's at the DuBois Distribution Center 'cause it was late 'cause of the weather?
> BC:   Okay.
> DH:   I didn't know if you could go and get it or if you wanted to or? It's in your name, or whatever. Or, not in your name, but the thingy.
> BC:   So, it's over at, over at UPS?
> DH:   I believe so. I can, I just gotta... The tracker says it's in Du, or, DuBois, PA.
> BC:   Okay. It doesn't say out for delivery?
> DH:   No. Let me check it one more time before I [U/I].
> [Voices overlap]
> BC:   Here, uh... Text me the tracking number and I'll call...
> DH:   Alright.
> [Voices overlap]
> BC:   I'll call over and ask about it.

HILLEBRAND then proceeded to text CODER the UPS tracking number.  HILLEBRAND and CODER continue to go back and forth via texts and calls, as CODER could not immediately locate the box.

90.     Later that day, starting at approximately 5:51 PM, they continue discussing the parcel.  Below is an excerpt from this conversation:

> BC:   Is it cream?
> DH:   No.
> BC:   Dude the box is way different than it normally is.
> DH:   How different?
> BC:   It's smaller. Really small.
> DH:   Yeah, well, that's 'cause you've been getting 30 p boxes. That's why.
> BC:   All right.
> DH:   Yeah, it's only 10 in there.

Further, earlier in the same conversation, HILLEBRAND asked CODER if CODER could bring it over to Reynoldsville, which is over 814-590-6231, the phone number designated "TARGET TELEPHONE 2" in the wire affidavits. Further, your Affiant is aware that when CODER asked HILLEBRAND if it was "cream" he was asking if the parcel contained methamphetamine. When HILLEBRAND tells him that its "only 10", which means the parcel contained 10 pounds of marijuana. Intercepted communications reveal that CODER and HILLEBRAND speak about parcels often.

91.      According to USPS records, from March 9, 2020, through April 26, 2021, 19 parcels suspected to contain narcotics have been mailed to **TARGET RESIDENCE 4**. Of those 19, seven parcels contained over 60 pounds of methamphetamine and 12 parcels contained over 180 pounds of marijuana. Your Affiant is aware that these amounts are known or suspected due to the contents of intercepted conversations, weights of the boxes, recipient addresses of the parcels, and the location from where the parcels were sent. As explained in greater detail below, this residence is associated with CODER.

92.      On August 2, 2021, a USPS Priority Mail parcel bearing USPS tracking number 9114 9022 0078 9152 0896 29, addressed to Christian Maldonado, PO Box 5224, Stockton, CA 95205, with a return address of Coder's Custom Contracting at the **TARGET RESIDENCE 4**.

35

USPS Priority Mail parcel was mailed from the Luthersburg Post Office, which your Affiant believes contained narcotics proceeds and was mailed to the distributor of the source of supply.

93.     On August 2, 2021, a USPS Priority Mail parcel bearing USPS tracking number 9114 9022 0078 9152 0896 29, addressed to Christian Maldonado, PO Box 5224, Stockton, CA 95205, with a return address of Coder's Custom Contracting at the **TARGET RESIDENCE 4**. USPS Priority Mail parcel was mailed from the Luthersburg Post Office, which your Affiant believes contained narcotics proceeds and was mailed to the distributor of the source of supply.

94.     On August 17, 2021, HSI SA Brianna Coleman conducted searches of the commercially available database Accurint.  **TARGET RESIDENCE 4** is currently associated with Brandon CODER.

95.     Also on August 17, 2021, SA Coleman queried the JNet and located a Pennsylvania driver's license for CODER, in which he utilizes **TARGET RESIDENCE 4.**

96.     Later on August 17, 2021, SA Coleman found that Brandon CODER has a criminal history that include an arrest on or about September 18, 2009, and CODER pleaded guilty to simple assault.  On or about February 12, 2002, CODER pleaded guilty to forgery.

97.     On August 20, 2021, Clarion Police Chief Bill Peck drove by **TARGET RESIDENCE 4** and saw a male that resembled CODER.

98.     Through toll record data obtained from T-Mobile, I am aware that from July 19, 2021, to August 16, 2021, there were approximately 155 contacts between HILLEBRAND, utilizing 814-699-2932, and Brandon CODER, utilizing 814-661-8308.

99.     This toll record analysis from July 19, 2021 to August 16, 2021, reveals toll record patterns consistent with toll records observed during wiretap interceptions that revealed

methamphetamine and marijuana distribution.   Based upon this continued pattern of communication, there is reasonable basis to believe that this continued communication pertains to the ongoing distribution of methamphetamine and marijuana.

## TARGET RESIDENCE 5

100.    The locations of **TARGET RESIDENCES 5** is associated with Brent SHAFFER, as described more fully below.  B. SHAFFER is an associate of HILLEBRAND.

101.    On September 13, 2020, SA Gaab informed investigators that information obtained through a USPS OIG database revealed that two parcels suspected to contain methamphetamine were sent from Sacramento, CA on September 12, 2020.  The first parcel, associated with tracking number 9505 5159 1762 0256 4606 06 (PARCEL 1) was sent to "Drew ATTEBERY" at 1957 Clark Rd. Olanta, PA 16863 (**TARGET RESIDENCE 5**) and listed a return address of "Michael STEVEN" 1537 Glenwood Dr. Modesto, CA 95359.  The second parcel, associated with tracking number 9505 5128 9721 0256 4628 83 (PARCEL 2) was sent to "Adam MCCARTHY" at 2238 Belsena Rd. Madera, PA 16661, listed a return address of "Chris MENDEZ" 215 Almond Ave Manteca, CA 95337.  Your Affiant is aware from his training and experience and form his knowledge of this investigation that those involved in illicit activities oftentimes utilize fictitious names on parcels of drugs or drug proceeds.

102.    Both parcels were consistent in weight – the first parcel weighed 7 lbs. 9 ounces, the second parcel weighed 7 pounds, 12 ounces – with other parcels containing methamphetamine as described by confidential sources that were being shipped from California.  The address of 2238 Belsena Rd. was listed as the return address package delivered to 354 Dutchtown Rd. on August 22, 2020, which investigators know was sent from California.

Investigators learned through USPS tracking that a parcel suspected to contain marijuana was previously shipped from Reno, Nevada to 2238 Belsena Rd.

103.   On September 13, 2020, SA Gaab retrieved PARCEL 2 from the Pennwood Place Processing and Distribution Center, located at 51 Pennwood Place, Warrendale, PA 15086 and secured the parcel in the USPS Drug Evidence Locker, per USPS policy and procedures.  The next day, SA Gaab removed the package and allowed Solo, a dog trained to detect controlled substances, and his handler, Allegheny County K-9 Police Officer Steven Dawkin, to examine the parcel.  Officer Dawkin informed SA Gaab that Solo indicated that the parcel contained controlled substances.

104.   On September 16, 2020, at 8:45 AM, investigators obtained a search warrant signed by United States Magistrate Judge Patricia L. Dodge, at Misc. Docket number 20-1880, authorizing a search of PARCEL 2.  Pursuant to that search warrant, investigators opened the parcel and recovered two Tupperware containers containing a crystal, substance that was submitted to the DEA lab and confirmed to be 2.2 kilograms of pure methamphetamine.

105.   Investigators learned that PARCEL 1 was scheduled for delivery at 9:15 AM on September 14, 2020, so PSP Troopers conducted physical surveillance in the area of **TARGET RESIDENCE 5** and 1873 Clark Rd.  Your Affiant is aware that **TARGET RESIDENCE 5** and 1873 Clark Rd. are located in close proximately to each other, with one trailer in between (pictured below).  That trailer is where B. SHAFFER's brother resides, who is on PA State Parole for aggravated assault, disarming a police officer, firearm not to be carried without a license, and other offenses.  So therefore, your Affiant is aware that these three trailers are all affiliated.

38



106.     At approximately 0908 hours, a black, single-cab Ford F-250 drove from a

woodlot behind **TARGET RESIDENCE 5** to the front of **TARGET RESIDENCE 5**.  B.

SHAFFER exited the driver side of the pickup, who Tpr. Howell knew from previous encounters

and having seen a photo of SHAFFER.   And walked onto the porch of **TARGET RESIDENCE**

**5.**  SHAFFER then stood around for approximately 10 minutes, as if he was waiting for

something, before departing from the area in his truck.  At 1000 hours, a United States Postal

Service (USPS) mail carrier pulled into the driveway of **TARGET RESIDENCE 5**.  The carrier

scanned a mail parcel and placed it on a table located on the front porch of **TARGET**

**RESIDENCE 5**.

107.     At 1119 hours, a black Volvo sedan bearing no registration, and a temporary

registration in the back window, pulled into the driveway of **TARGET RESIDENCE 5**.

HILLEBRAND, who was identified previously during surveillance and personal interactions

during the course of his cooperation with law enforcement, exited the driver's side door.  Tpr.

Howell positively identified HILLEBRAND from previous surveillance, and personal contact.

39

Tpr. Howell observed HILLEBRAND to stand by his vehicle smoking a cigarette as he looked towards the direction of the package.  HILLEBRAND then walked onto the front porch of the residence, to which Tpr. Howell observed him hover over the package.  HILLEBRAND then walked to the front door and knocked on the door, to which no one answered.  HILLEBRAND then walked back over to the package.  It appeared HILLEBRAND was being very cautious and was constantly looking around to see if anyone was present.  At approximately 1124 hours, HILLEBRAND took the package off the table, and walked back towards his vehicle. HILLEBRAND then sat in the driver's seat of his vehicle with the package.  A few minutes later, HILLEBRAND exited the vehicle still holding the package, and walked back towards the trunk of the vehicle.  It appeared HILLEBRAND was going to place the package in the trunk, but then walked the package back over to **TARGET RESIDENCE 5**.  Tpr. Howell then observed HILLEBRAND to place the package on the floor of the porch, and not back on the table where it was originally located.  HILLEBRAND then got back into his vehicle, to which Tpr. Howell observed him back out of the driveway and continued to back up on Clark Road to 1873 Clark Rd.  HILLEBRAND then pulled into 1873 Clark Rd.  HILLEBRAND exited his vehicle, to which Tpr. Howell could see him talking with two other unknown individuals.  Tpr. Howell then observed HILLEBRAND open his trunk, to which he retrieved something from a red and black duffle bag.  It was unknown what the item was.  HILLEBRAND then went into the residence of 1873 Clark Rd. for a few minutes.  Tpr. Howell observed HILLEBRAND return to his vehicle and leave 1873 Clark Rd. traveling north on Clark Road out of sight.  Tpr. Howell continued surveillance until 1430 hours, at which point Tpr. Howell terminated surveillance.

      108.    Your Affiant is aware that the Organization utilizes fictitious names on the parcels

in order to insulate themselves from law enforcement detection.  Further, based on the contents of PARCEL 2, and based on my training and experience and knowledge of this investigation, I believe that PARCEL 1 also contained methamphetamine.

109.    On October 27, 2020, Trooper Lance Howell and your Affiant were notified by Adam Gaab (US Postal, OIG) of an incoming package of suspected methamphetamine, tracking number 9505 5100 5492 0300 2882 20, from Verdi, Nevada to 1873 CLARK Rd.

110.    On October 28, 2020, at approximately 9:15 am, Tpr. James Price and Howell were performing surveillance at 1873 CLARK Rd. Troopers Howell and Price had a clear view of the residence of 1873 CLARK Rd.  At approximately 10:07 am, Trp. Howell observed the postal courier driving a red in color Jeep Compass, pull into the driveway of 1873 CLARK Rd.

111.    Tpr. Howell observed a female and sole occupant of the vehicle, identified to be Amy Beth BORTOT ("BORTOT").  Trp. Howell observed BORTOT retrieve a large box, white in color, along with other paper mail from her vehicle.  BORTOT then walked onto the front porch of the residence and stood there for a short period of time.  Trp. Howell then observed BORTOT walk off the porch and approach a gold in color Chevrolet Trail Blazer that was backed in the driveway and appeared to be broken down.  BORTOT then opened the driver side rear passenger door and placed the white in color box package along with the other mail on the back seat.  BORTOT then got back into her vehicle and traveled south on Clark road, out of sight.

112.    At approximately 11:15 am, Trooper Howell and Price conducted a ping location on Derek HILLEBRAND'S cell phone.  Results indicated that HILLEBRAND'S location was in close proximity to 1873 CLARK RD.

113.    On February 3, 2021 at 9:02 pm, HILLEBRAND placed an outgoing call to Brent

SHAFFER using cellular telephone number 814-553-2933.  SHAFFER had money for

HILLEBRAND from a recent purchase of cocaine and SHAFFER wanted to know if

HILLEBRAND needed the cash before he left for Tampa Bay, FL and the Super Bowl.

HILLEBRAND stated that he did not need the cash and SHAFFER stated, "Alright.  Then I'll

just leave it up my dad's house," SHAFFER was referring to **TARGET RESIDENCE 5**.

HILLEBRAND replied "Alright. You're good. Yeah," and SHAFFER replied "It's

[U/I]…tucked away where it's safe and sound.  I just wanted to let you know in case you need it.

That's all."   SHAFFER then informed HILLEBRAND that the cocaine had "six in it" meaning 6

ounces.  SHAFFER stated that HILLEBRAND informed SHAFFER when he gave it to him that

"it was between five and six. It's closer to six, I think".  HILLEBRAND then informed

SHAFFER that it was "probably because it was already broke down".  SHAFFER informed

HILLEBRAND that the reason was he had bad baking soda or something.  SHAFFER stated that

"I tried to fucking cook some up, and it just wouldn't get hard," meaning that SHAFFER

attempted to process the cocaine into crack cocaine but because of the baking soda the process in

doing so was not possible.  SHAFFER then confirmed "It tasted real good, but I didn't

know…It's either bad soda, or it's a…I don't…I really don't think it's the shit that the other guy

did to it thought. I don't know."  SHAFFER continued to explain why he felt it would not

process into crack cocaine was his baking soda and not that someone had already added a cutting

agent to the cocaine.  HILLEBRAND then asked SHAFFER "You think it's just your soda?" and

SHAFFER replied "Yeah, I think just the soda's bad cause I got it off my dad.  He probably had

it up there for fucking years."  SHAFFER was referring to his father who lives at TARGET

RESIDENCE 5.

114.     According to USPS records, from August 11, 2020, through December 17, 2020, seven parcels were mailed to 1873 Clark Rd.  Of the seven, three parcels contained nearly 30 pounds of suspected methamphetamine.  The other four parcels contained over 58 pounds of marijuana.  Your Affiant is aware that these amounts are known or suspected due to the contents of intercepted conversations and known addresses.  As explained in greater detail below, this residence is B. SHAFFER's parents' address.

115.     According to USPS records, from June 12, 2020, through March 17, 2021, 12 parcels were mailed to **TARGET RESIDENCE 5**.  One parcel contained over 12 pounds of methamphetamine and another parcel contained over seven pounds of suspected methamphetamine.  The other parcels contained over 130 pounds of marijuana.  Your Affiant is aware that these amounts are known or suspected due to the contents of intercepted conversations and known addresses.  As explained in greater detail below, this residence is associated with B. SHAFFER.

116.     Further, your Affiant is aware that many other addresses in the Clearfield and Jefferson Counties also received parcels of known or suspected drugs, in furtherance of these crimes by associates of the Organization.

117.     On August 17, 2021, HSI SA Brianna Coleman conducted searches of the commercially available database Accurint.  **TARGET RESIDENCE 5** is currently associated with B. SHAFFER, however he was recently associated with 1873 Clark Rd, which is believed to be B. SHAFFER's parents' residence**.**

118.    SA Coleman located a Pennsylvania license for B. SHAFFER, in which he utilizes 1873 Clark Rd., which as stated above is believed to be his parents' address.

119.    B. SHAFFER also appears to be a convicted felon and has a current warrant for his arrest for a probation violation.  On or about September 12, 2006, B. SHAFFER pleaded guilty to manufacture of a controlled substance (felony), by the Pennsylvania State Police at Docket number: CP-17-CR-0001113-2006.  On or about September 10, 2016, B. SHAFFER pleaded guilty to possession of a controlled substance.  On or about June 15, 2016, B. SHAFFER pleaded guilty to possession of a controlled substance (felony) by Punxsutawney Police Department, at Docket number: CP-33-CR-0000590-2016.  On or about August 1, 2017, B. SHAFFER pleaded guilty to possession of drug paraphernalia.  As of B. SHAFFER's last arrest in 2018, he was listed at **TARGET RESIDENCE 5**.

120.    Through toll record data obtained from T-Mobile, I am aware that from January 2021 through August 21, 2021, there were numerous communications between HILLEBRAND, utilizing 814-699-2932 and 814-762-1003, and Br. Shaffer, utilizing 814-553-2933.

121.    This toll record analysis reveals toll record patterns consistent with toll records observed during wiretap interceptions that revealed methamphetamine and marijuana distribution.  Based upon this continued pattern of communication, there is reasonable basis to believe that these continued communications pertain to the ongoing distribution of methamphetamine and marijuana.

122.    On August 23, 2021, Tpr. Howell saw B. SHAFFER leave from **TARGET RESIDENCE 5.**  Further, Tpr. Howell saw B. SHAFFER's father around the 1873 Clark Rd**.**

### **TARGET RESIDENCE 6**

125.     Your Affiant is aware that **TARGET RESIDENCE 6** is associated with Darnell SMITH.  SMITH is an associate of HILLEBRAND and CHARLAN.

126.     Early on in the investigation, investigators believed that SMITH was one of the leaders of the Organization who also has direct contact with the California source of supply. SMITH distributes large quantities of methamphetamine, cocaine and marijuana in Allegheny County and its surrounding counties. As set forth below, investigators believe that SMITH uses cell phone number 412-773-9582, which is subscribed to "Alex Rodriguez" (former New York Yankee great), 6006 Broad Street, Pittsburgh, PA 15206.  Your Affiant is aware that those involved in illicit activities oftentimes utilize fictitious names in order to insulate themselves from law enforcement detection.  HILLEBRAND provided this number to investigators as the cell phone number that SMITH used to arrange for the distribution of methamphetamine, cocaine, marijuana, and other narcotics.  Additionally, Investigators have observed SMITH on video surveillance bringing packages to post offices to ship to California.  SMITH's GPS Location Data has shown him in the general area of the post office when SMITH is seen sending a package.  Finally, SMITH's GPS Location Data often places SMITH in the vicinity of his residence at 232 Seabright Street, Pittsburgh, PA 15214.

127.     Francisco BARBA is another co-conspirator and distributor of narcotics, residing in California.  Additionally, toll records have shown communications between 209-981-5181 (number used by BARBA), and cell phone numbers associated with numerous other members of the conspiracy, including SMITH.  During a traffic stop of HILLEBRAND in September of 2020, law enforcement officers seized a ledger.  Inside the ledger was notation reading, "Send 2 Francisco BARBA P.O. Box 2276 Manteca, 95336".  And, as set forth below, Investigators

identified a parcel that was sent from Pittsburgh, PA by SMITH to BARBA on September 14, 2020.

128.    In an attempt to be released from state prison, HILLEBRAND agreed to be debriefed relative to his involvement in the illegal distribution of drugs.   During the debriefing, HILLEBRAND identified SMITH and others as drug traffickers, who are distributing large quantities of methamphetamine in Clearfield County.  HILLEBRAND stated that he has known SMITH for over a year.

129.    On September 10, 2020, D. SMITH sent a package (which your Affiant believes likely contained U.S. currency) from the Pittsburgh Main Post Office, located at 1001 California Avenue, Pittsburgh, PA 15290, to Francisco Barba at 6157 Buckskin Pl., Stockton, CA 95210.

130.    In an intercepted call, on December 4, 2020, HILLEBRAND instructed the female user of cell phone number 814-591-2381, (used by Christine SHAFFER), to go to SMITH's residence at 232 Seabright Street in Pittsburgh, PA to pick up money from SMITH and another conspirator. Based on the interceptions, investigations believed that there would be an exchange of marijuana and possibly money.  While investigators were intercepting the call, surveillance units responded to 232 Seabright Street and observed a female talking on the phone.

131.    At approximately 1514 hours, DEA TFO Randy Grossman observed a gold colored Volkswagen station wagon pull onto Seabright Street with PA Registration: LBD7041. TFO Grossman observed the Volkswagen pull directly in front of 232 Seabright Street.  TFO Grossman ran the PA registration through Jnet and learned that it was a dual registration, and was registered to the passenger, C. SHAFFER.

132.    At approximately 1518 hours, TFO Grossman observed SMITH exit his residence and approach the Volkswagen.   SMITH then went back to his residence, returning at approximately 1520 hours. The rear hatch of the Volkswagen opened and SMITH could be seen at the rear of the vehicle.   SMITH then closed the rear hatch and the vehicle departed.

133.    When the Volkswagen departed from the area, TFO Grossman positively identified the passenger as C. SHAFFER and the driver as Kristy LEPIONKA.

134.    On December 27, 2020, at approximately 4:59 PM, HILLEBRAND, received an incoming text from CHARLAN, stating, "245,100. Texting D now."  I believe CHARLAN advised HILLEBRAND that the balance that he owes is $245,100 for payment of previous narcotic transactions.  Investigators further believe CHARLAN advised HILLEBRAND he was going to text SMITH when he stated, "Texting D now," to make arrangements for SMITH to provide money to HILLEBRAND.

135.    During the second round of interceptions of HILLEBRAND, which was obtained and approved on December 22, 2020, by Chief United States District Judge Mark R. Hornak, Western District of Pennsylvania, at Misc. No. 20-1594(a), investigators learned that HILLEBRAND and CHARLAN were starting to phase SMITH out due to the fact that SMITH owed both of them a large amount of currency.   Currently, SMITH is still speaking with CHARLAN based on the toll records.

136.    Through the course of this investigation, it was determined that SMITH purchases marijuana from CHARLAN.   CHARLAN then facilities the shipment of marijuana to SMITH. SMITH is also known to ship bulk currency to California.  Interceptions also reveal that SMITH and the others often fight over unpaid drug debts.

137.    The investigation has revealed that it does not appear as though members of the Organization have legitimate sources of income or sufficient legitimate income to cover their expenditures.  For example, records obtained from the Rivers Casino in Pittsburgh reveal that SMITH has spent over $500,000 in cash gambling at the casino.  Your Affiant is aware that subjects involved in illicit activities oftentimes utilize casinos, not only to gamble, but in an attempt to "clean" or legitimize their illegal earnings.  On August 9, 2021, HSI SA Brianna Coleman conducted a search of the PA Department of Labor and Industry.  SMITH does not have any reported income since 2019.

138.    On August 23, 2021, TFO Grossman again conducted surveillance of **TARGET RESIDENCE 6** and saw SMITH exiting the residence with a female and child.  Further, a vehicle registered to SMITH was also observed outside of the residence.  TFO Grossman identified SMITH based on a review of his PA driver's license photo.

139.    SMITH also appears to be a convicted felon and has arrests in multiple states.  On or about December 3, 2007, SMITH was convicted of conspiracy to possess cocaine by the DEA. On or about May 29, 2004, SMITH was found guilty of abuse family- assault, in HI.  On or about September 29, 2004, SMITH was found guilty of harassment, also in HI.  On or about August 1, 2007, SMITH pleaded guilty to corrupt organizations, manufacture of a controlled substance, and criminal conspiracy by the PA Attorney General's Office at Docket number: CP-02-CR-0001355-2008.  On or about September 12, 2012, SMITH pleaded guilty to possession of a firearm, manufacture of a controlled substance, possession of a controlled substance, small amount of marijuana, and drug paraphernalia, by Pittsburgh Bureau of Police at Docket number: CP-02-CR-0014505-2014.

140.     Through toll record data obtained from Verizon, I am aware that from July 23, 2021, to August 10, 2021, there were approximately seven communications between CHARLAN, utilizing 209-687-2869, and 412-773-9582, a phone used by Darnell SMITH.

141.     This toll record analysis from July 23, 2021 to August 10, 2021, reveals toll record patterns consistent with toll records observed during wiretap interceptions that revealed methamphetamine and marijuana distribution.   Based upon this continued pattern of communication, there is reasonable basis to believe that this continued communication pertains to the ongoing distribution of methamphetamine and marijuana.

### TARGET RESIDENCE 7

142.     Your Affiant is aware that **TARGET RESIDENCE 7** is associated with Terrence DOUGHERTY, who purchases narcotics form CHARLAN.

143.     DOUGHERTY was identified as the user of phone number 412-312-0780, with no subscriber information.  Communication intercepted during the prior period, signed on January 27, 2021, at Docket Number 20-1594(b), by Chief Justice Hornak, confirmed that DOUGHERTY is a drug customer of CHARLAN.  On February 5, 2021, Investigators observed a male arrive at 235 E. Main St. in Carnegie, which was the address given to CHARLAN by DOUGHERTY, via text message, for a parcel containing methamphetamine to be delivered, as set forth below.  DOUGHERTY arrived in a Dark Audi A8, PA registration: LKB-4587, which is registered to Terrence DOUGHERTY, 95 Sterrett St. Pittsburgh PA.  Investigators accessed DOUGHERTY's JNET photo and confirmed that he was the individual observed retrieving the parcel containing methamphetamine shipped by CHARLAN.

49

144.    On February 4, 2021, at 4:58 pm, CHARLAN, using phone number 209-401-5074, which was identified as "TARGET TELEPHONE 4" in the TIII affidavits, placed an outgoing phone call to DOUGHERTY, utilizing 412-312-0780, asking for an address to send the methamphetamine.   At 5:00 pm, DOUGHERTY, utilizing 412-312-0780, sent a text message replying to CHARLAN, using 209-401-5074, stating, "235 East main st Floor 2 (front) Pittsburgh, PA. 15106 Make."   Based on your Affiant's training, experience, and knowledge of this investigation, I believe that DOUGHERTY instructed CHARLAN to send the parcel containing methamphetamine to the front apartment located at 235 E Main Street, Floor 2 Pittsburgh, PA 15106.

145.    Immediately following the previous text messages, DOUGHERTY, utilizing 412-312-0780, sent another text message to CHARLAN, using 209-401-5074, stating, "Front ain't necessary but they delivered to neighbor behind me last time." At 5:01 pm, DOUGHERTY, utilizing 412-312-0780, sent another text message to CHARLAN, using 209-401-5074, stating, "I'll make sure I'm there to watch it drop tho." Based on your Affiant's training, experience, and knowledge of this investigation, I believe that DOUGHERTY was informing CHARLAN that DOUGHERTY would be at the apartment to receive the parcel from the UPS delivery driver.

146.    At 5:09 pm, CHARLAN sent an outgoing text message from 209-401-5074 to DOUGHERTY, utilizing 412-312-0780, confirming the name and address "Elijah Lewis 235 E Main Street Floor 2 (front) Pittsburgh, PA. 15106," and DOUGHERTY, utilizing 412-312-0780, responded via text message to CHARLAN on 209-401-5074, stating "Got it".   Based on your Affiant's training, experience, and knowledge of this investigation, I believe that CHARLAN was

confirming that he had the correct mailing address and DOUGHERTY assured CHARLAN that CHARLAN had the correct address.

147.    On February 4, 2021 at approximately 5:13 PM, CHARLAN, utilizing 209-401-5074, placed an outgoing text to UM8044, utilizing 775-437-8044, stating, "Overnight UPS From Joseph Lewis 436 Anne Marie CT Reno, NV 89509 To Elijah Lewis 235 E Main Street Floor 2 (front) Carneige, PA. 15106."  Based on your Affiant's training, experience, and knowledge of this investigation, I believe that CHARLAN provided the mailing address for unidentified male 8044 (UM8044) to use to ship the UPS parcel containing ten pounds of methamphetamine that DOUGHERTY ordered.

148.    On February 4, 2021, at approximately 10:45 PM, CHARLAN, utilizing 209-401-5074, sent an outgoing picture text message of a UPS receipt to DOUGHERTY, utilizing 412-312-0780.  The intercepted receipt listed the recipient as Elijah Lewis, 235 E Main St, Fl 2, FRNT Front, Carnegie, PA 15106-2785 and the sender as Joseph Lewis, 436 Anne Marie Ct, Reno, NV 89509, Tel: (775) 360-1819.    The receipt further revealed a tracking number of 1Z0V4V91318215798.

149.    On February 5, 2021 at 10:05 am, CHARLAN sent an outgoing text message from 209-401-5074 to DOUGHERTY, using 412-312-0780, providing DOUGHERTY with the tracking number of the package containing methamphetamine "1z4ov4v91318215798".  CHARLAN again sends an outgoing text message from 209-401-5074 at 12:19 pm, "1z40v4v91318215798".  Based on your Affiant's training, experience, and knowledge of this investigation, I believe that CHARLAN was making sure that DOUGHERTY was aware that the

tracking number for the parcel containing ten pounds of methamphetamine ("PARCEL 5") was 1Z0V4V91318215798.

150. CHARLAN sent several text messages from 209-401-5074 to 412-312-0780, utilized by DOUGHERTY, attempting to reach DOUGHERTY. At 1:16 pm, CHARLAN sends an outgoing text message from 209-401-5074 to DOUGHERTY stating "Hey that's delivered as of 5 minutes ag,o" "Your making me nervous so I'ma send my boy Jeremy to check the porch," "Is today your bbay." At 2:28 pm, CHARLAN sends another outgoing text message from 209-401-5074 to DOUGHERTY using 412-312-0780 stating "235 E Main Street 2nd Floor Carnegie, PA. 15106." Based on your Affiant's training, experience, and knowledge of this investigation, I believe that CHARLAN was concerned that DOUGHERTY had not responded to his text messages. Additionally, CHARLAN was aware, based on the tracking information, that PARCEL 5 had been delivered, and CHARLAN was going to send an associate named Jeremy to check DOUGHERTY's porch to make sure that PARCEL 5 had not been taken.

151. At 2:38 PM, CHARLAN received an incoming text message on 209-401-5074 from DOUGHERTY stating, "Phone was fucked up im On my way! There now. Had someone waiting I'll call you in fifteen." Based on your Affiant's training, experience, and knowledge of this investigation, I believe that DOUGHERTY informed CHARLAN that DOUGHERTY had an issue with his phone, but DOUGHERTY was going to retrieve the package at that time.

152. At 2:52 PM, Pittsburgh Bureau of Police (PBP) officers conducting surveillance observed a 2008 black Audi with PA registration LKB-4587, which according to PennDOT records, is registered to Terrence DOUGHERTY at 95 Sterrett St. Pittsburgh, PA 15205,, arrive in front of the building located at 235 E Main Street, Carnegie, PA 15205. Through DOUGHERTY's

Pennsylvania driver's license photo, PBP officers conducting surveillance were able to identify the driver of the Audi as DOUGHERTY. The address listed on DOUGHTERTY's driver's license is 95 Sterrett St., Pittsburgh, PA 15205.

153.    PBP officers observed DOUGHERTY exit his vehicle wearing black pants, a black sweatshirt, and a grey t-shirt and walk around the front of the building located at 235 E Main Street and look for the UPS parcel before proceeding inside the building and going upstairs. DOUGHERTY exited the building and began speaking with an unknown black male briefly before returning inside of the building at 2:54 PM.

154.    At 2:56 PM, CHARLAN received an incoming text message on 209-401-5074 from DOUGHERTY, utilizing 412-312-0780, stating "Yoooo." DOUGHERTY followed that text message up with another text message to CHARLAN, at 209-401-5074, stating, "Yoooo HMU soon as you see this."

155.    At 2:58 PM, DOUGHERTY was observed by PBP officers exiting 235 E. Main St. and returning to his Audi where he was observed talking on his phone.

156.    At 3:02 PM, PBP officers observed DOUGHERTY exit his vehicle and walk between the buildings to the rear of the building. At 3:12 PM, DOUGHERTY returned to the front of the building and checked the mailbox.

157.    At 3:14 PM, DOUGHERTY entered 235 E. Main St again until 3:23 PM, when DOUGHERTY returned to his vehicle.

158.    At 3:13 PM, CHARLAN received another incoming text message on 209-401-5074, again from DOUGHERTY, utilizing 412-312-0780, stating, "Yooooooo." At 3:17 PM, CHARLAN received another incoming text message on 209-401-5074 from DOUGHERTY,

utilizing 412-312-0780, stating, "Please call me."   At 3:26 PM, CHARLAN received another incoming text message on 209-401-5074 from DOUGHERTY stating, "Yoooo please get back to me."

159.   At 3:30 PM, DOUGHERTY departed from the front of the building and began driving around the area.

160.   At 3:40 PM, CHARLAN received an incoming telephone call on 209-401-5074 from 412-312-0780, utilized by DOUGHERTY.   Below is an excerpt from the transcript the intercepted call between CHARLAN (GC) and DOUGHERTY (TD).

> GC: If – if this is gone, I have a feeling you're not gonna pay me or nothing, man. I always come through for you, and we even have like 12 grand back tax you know?
> TD: Uh
> GC: And I, like I don't know why you want to fuck me over like this, man. I just – I always try to come through.
> [Voices overlap]
> TD: Of course I'll pay you, bro. Of course I'd pay you. What do you mean?
> GC: I'm just saying, like, I, I, I'm still waiting for like 12 Gs from what you owe me a long time ago,  you know, and I keep coming through for you, and like, everyone else, no one has any problems. Like, you know what I mean? With the UPS shit, that shit's gotta be there. I, I hit you up like before, like an hour before, I hit you up right when it was delivered. I've been blowing both of your phone up that – your main rang once, and then all of a sudden it was off.

Your Affiant is aware that DOUGHERTY and CHARLAN are discussing the possibility that a parcel is lost.  CHARLAN is also telling DOUGHERTY that he still owes him money, when he says "I'm still waiting for like 12 Gs", which your Affiant knows to mean $12,000.  Further, CHARLAN says, "So it's not like a ten back of bud, bro.  This shit's a fucking – you know, that's, that's a fucking – that's 45,000 bucks right there."  CHARLAN also tells DOUGHERTY, "I've

been so patient waiting for that last 12 fucking grand, I barely even bring it up, and I just kept sending you cream." DOUGHERTY responds a bit later in the conversation, "let's keep it non threatening yo".

161.    Your Affiant is aware based on his training and experience and knowledge of the investigation, "So it's not like a ten pack of bud, bro. This shit's a fucking – you know, that's, that's a fucking – that's 45,000 bucks right there." I believe that CHARLAN was stating that the package contained ten pounds of methamphetamine worth $45,000 rather than ten pounds of marijuana, which is worth significantly less.

162.    At 3:56 pm, CHARLAN received an incoming telephone call on 209-401-5074 from 412-312-0780, utilized by DOUGHERTY.  Below is an excerpt from the transcript of the intercepted call between CHARLAN (GC) and DOUGHERTY (TD):

> GC:    It was there?
> TD:    Yeah, I fucking got it.

163.    Based on the additional conversation, your Affiant believes that when DOUGHERTY stated "and fucking... You know what I mean? But... [Sighs] Fucking thank good-... This is like my fucking birthday present from fucking U-P, U-S, UPS Jesus or something. I don't know." He advised CHARLAN it was his birthday.  Your affiant is aware that DOUGHERTY'S DOB is February 5, 1993.

164.    At 4:00 PM, PBP officers observed DOUGHERTY retrieve PARCEL 5 from 225 E. Main St. Carnegie PA and depart the area.  PBP officers were unable to maintain sight of DOUGHTERY.  PBP officers went to 95 Sterrett St. Pittsburgh, PA, DOUGHERTY's listed address, to see if DOUGHERTY returned to the residence, but he was not observed there.

165.     On February 12, 2021 at 10:01 AM, CHARLAN, utilizing 209-401-5074 sent an outgoing text message to DOUGHERTY, using 412-328-0250, asking "What's going on bro? You good or what?" Based on your Affiant's training, experience, and knowledge of this investigation, I believe that CHARLAN was referring to the money that DOUGHERTY owed CHARLAN for the methamphetamine that CHARLAN supplied to DOUGHERTY several days earlier.

166.     DOUGHERTY, using 412-328-0250, responded via text message to CHARLAN, using 209-401-5074, at 11:54 AM on February 12, 2021, "Ya I'm good just got back. Do sorts random shit goin on tho. Thus bitch is telling me she's pregnant and I'm the dad." At 3:25 PM, DOUGHERTY, using 412-328-0250, sent another text message to CHARLAN, using 209-401-5074, stating, "I'm get it figured out in the next day or two."  At 4:37 PM, DOUGHERTY, using 412-328-0250, sent another text message to CHARLAN on 209-401-5074 stating, "I can send out at least half that Monday."   Based on your Affiant's training, experience, and knowledge of this investigation, I believe that DOUGHERTY was telling CHARLAN that DOUGHERTY was still collecting money from his drug customers and he would send at least half of the money owed to CHARLAN for methamphetamine on Monday.

167.     Based on additional interceptions of CHARLAN, investigators found out that DOUGHERTY was using a new phone number.   Through the continued interceptions of CHARLAN, DOUGHERTY continued to make purchases of methamphetamine.

168.     Your Affiant was made aware that on March 11, 2021, Robinson Township Police conducted a traffic stop on DOUGHERTY driving his Audi, which was bearing Pennsylvania registration LKB-4587. Patrolman Richard Kadlecik could smell an odor of fresh marijuana.  Ptl. Kadlecik also noticed DOUGHERTY had a large bulge in his front pants pocket, which turned out

to be $1,600 in US currency.  DOUGHERTY admitted to having a rolled joint in the ashtray. During a consent search of the vehicle, several unused US postal boxes and two boxes of food saver bags, along with $12,000, was located, but not seized.  Ptl. Kadlecik also observed a fabricated side compartment.  Your Affiant believes that DOUGHERTY was planning to mail heat-sealed money, which would be payment for his drugs.

169.     On April 14, 2021, at approximately 4:19 PM, CHARLAN, utilizing 412-216-0999, placed an outgoing text to DOUGHERTY utilizing the 412-328-0250, stating, "You trying to stick with 10 lbs or u wanna do 20?"  Based on your Affiant's training, experience, and knowledge of this investigation, I believe CHARLAN asked DOUGHERTY if DOUGHERTY wanted to purchase either 10 or 20 pounds of methamphetamine on his next transaction.

170.     On April 14, 2021, at approximately 8:49 PM, CHARLAN, utilizing 412-216-0999, received an incoming text from DOUGHERTY utilizing the 412-328-0250, stating, "I'm down for 20 by the way."  Based on your Affiant's training, experience, and knowledge of this investigation, I believe DOUGHERTY advised CHARLAN that DOUGHERTY wanted to order 20 pounds of methamphetamine.

171.     On April 15, 2021, at approximately 3:17 PM, CHARLAN, utilizing 412-216-0999, placed an outgoing text to DOUGHERTY utilizing 412-328-0250, stating, "I'm trying to get this kream to u but I like to be sure to be paid up before I send more of this stuff you know."  Based on your Affiant's training, experience, and knowledge of this investigation, I believe CHARLAN advised DOUGHERTY that DOUGHERTY needed to pay CHARLAN the money that DOUGHERTY owed to CHARLAN from a previous narcotics transaction before CHARLAN would mail DOUGHERTY more methamphetamine.

172.     On April 21, 2021, your Affiant learned that Mount Lebanon Police Department conducted a traffic stop on DOUGHERTY driving the Audi.  At the time of the stop, DOUGHERTY provided police with his address as **TARGET RESIDENCE 7**.

173.     On April 23, 2021, investigators conducted surveillance of DOUGHERTY picking up USPS parcel, bearing 9505 5100 4992 1110 3398 96, containing methamphetamine shipped from Reno, NV by CHARLAN.  Based on the interceptions of CHARLAN, which was read and approved by Chief United States District Judge Hornak at Magistrate Number 20-1594(d) on April 7, 2021, investigators knew the parcel to contain methamphetamine.   The Postal carrier was observed delivering the USPS parcel on the sidewalk outside the gate at 235 E Main St, Carnegie, PA 15106. Postal Inspector (PI) Lindsey Weckerly observed DOUGHERTY walking down the north side sidewalk of E Main St, Carnegie, PA.

174.     At 11:49 AM, on April 23, 2021, CHARLAN received an incoming text message on 412-216-0999 from DOUGHERTY stating, "Got it."  Then at 12:10 PM PI Weckerly observed DOUGHERTY exit the gate with the USPS parcel in his hands. DOUGHERTY walked northbound on the west side sidewalk of E Main St and met with an unidentified individual, later identified as Justin KOHLER ("KOHLER").

175.     At 12:11, on that same day,  PM PPD Sgt. Scott Lukitsch observed DOUGHERTY and KOHLER enter a 2011 white Dodge Caliber SUV, registered to Justin KOHLER. Sgt. Lukitsch received a copy of KOHLER's Pennsylvania driver's license photograph and immediately recognized the driver of the Dodge Caliber as KOHLER. Sgt. Lukitsch then observed DOUGHERTY place the USPS parcel in the white Dodge Caliber and enter the front passenger side door. KOHLER was then observed entering the driver's door of the white Dodge Caliber.

176.    Investigators continued mobile surveillance on KOHLER's vehicle.  Then at 12:24 PM, on that same day, KOHLER's vehicle arrived at 2915 Potomac Ave, Pittsburgh, PA.  Then at 12:25 PM Sgt. Lukitsch observed DOUGHERTY and KOHLER enter the residence through the front door.

177.    On August 5, 2021, PBP Sgt. Lukitsch drove by the **TARGET RESIDENCE 7** and observed DOUGHERTY's vehicle backed in.

178.    On August 17, 2021, Sgt. Lukitsch drove by the **TARGET RESIDENCE 7** again and observed DOUGHERTY's vehicle backed in.

179.    Through the course of this investigation, it was determined that DOUGHERY purchases methamphetamine from CHARLAN.    The parcels are then shipped from MALDONADO.  Further, MALDONADO pays another co-conspirator, Armando RAZO, who resides in California, for the methamphetamine on behalf of CHARLAN.

180.    Through toll record data obtained from Verizon, I am aware that from July 21, 2021, to August 22, 2021, there were approximately one hundred and seventy-six communications between CHARLAN, utilizing TARGET TELEPHONE 4, and DOUGHERTY, utilizing telephone number (412) 328-0250.  I believe that this extensive communication evidences DOUGHERTY's continued participation in this drug trafficking organization.

181.    This toll record analysis from July 21, 2021 to August 22, 2021, reveals toll record patterns consistent with toll records observed during wiretap interceptions that revealed methamphetamine and marijuana distribution.    Based upon this continued pattern of communication, there is reasonable basis to believe that this continued communication pertains to the ongoing distribution of methamphetamine and marijuana.

182.    DOUGHERTY has been convicted of misdemeanor drug trafficking charges.  On or about April 6, 2018, DOUGHERTY was convicted of possessing a controlled substance, drug paraphernalia, and intentionally purchasing or receiving a controlled substance etc. from an unauthorized source at Docket number: CP-02-CR-0010819-2018.

### TARGET RESIDENCE 8

183.    Your Affiant is aware that **TARGET RESIDENCE 8** is associated with Douglas AUSTEN.  AUSTEN is an associate of DOUGHERTY.

184.    On June 9, 2021, your Affiant participated in a controlled purchase of narcotics from AUSTEN.  During the evening hours, at approximately 5:25 PM, investigators observed AUSTEN arrive at **TARGET RESIDENCE 8.**  Investigators observed as AUSTEN, identified based on a review of his PA license photo, get out of the vehicle and carry a yellow plastic bag into **TARGET RESIDENCE 8.**

185.    At approximately 5:29 PM a cooperating source (CS) and your Affiant, acting in an undercover capacity, arrived at **TARGET RESIDENCE 8.**   The CS went into **TARGET RESIDENCE 8** and then approximately two minutes later, departed from **TARGET RESIDENCE 8.**

186.    The CS ultimately purchased methamphetamine from AUSTEN for $1,800.

187.    The narcotics were submitted to the lab and then your Affiant obtained a report from the DEA Northeast Laboratory, dated August 19, 2021, which revealed 84.2 grams tested positive for methamphetamine.

188.    On August 23, 2021, SA Coleman conducted a query of Accurint and saw that AUSTEN is recently associated with **TARGET RESIDENCE 8.**

189.     Also on August 23, 2021, SA Coleman reviewed AUSTEN's criminal history.  As of AUSTEN's most recent arrest on January 7, 2021, AUSTEN is listed at **TARGET RESIDENCE 8.**  AUSTEN has multiple arrests for drugs, in multiple states.  AUSTEN appears to be a convicted felon.  On or about November 21, 2008, AUSTEN was arrested by DEA for possession of marijuana, disposition unknown.  On or about April 20, 2001, AUSTEN pleaded guilty to receiving stolen property by Pittsburgh Bureau of Police (PBP).  On or about April 23, 2001, AUSTEN pleaded guilty to manufacture of a controlled substance (felony) by Pennsylvania State Police, at Docket number: CP-02-CR-0006993-2001.  On or about May 23, 2001, AUSTEN pleaded guilty to fleeing and alluding PBP.  On or about December 30, 2001, AUSTEN pleaded guilty to possession of a controlled substance by PBP.  On or about April 13, 2005, AUSTEN pleaded guilty to manufacturing a controlled substance (felony), possession of a controlled substance, drug paraphernalia, and person not to possess a firearm by PBP at Docket number: CP-02-CR-0010720-2004.  On or about August 8, 2008, AUSTEN pleaded guilty to DUI.  AUSTEN also plead guilty to disorderly conduct in 2010.  On or about August 31, 2008, AUSTEN was arrested for possession of a controlled substance and pleaded guilty to drug paraphernalia.  On or about October 8, 2012, AUSTEN pleaded guilty to possession of a controlled substance.   On or about November 5, 2008, AUSTEN was found guilty of operating on suspended or revoked license, improper registration plate, and trafficking in marijuana (felony), by Boone County (KY) Sheriff's Office at case number: 08-CR-00686.  On or about July 30, 2008, AUSTEN absconded on a charge of possession of marijuana less than 2 ounces, by Cass County (TX) Sheriff's Office and the final disposition is unknown.  AUSTEN also appears to be currently wanted.

190.    The CI reached out to AUSTEN during the week of August 23, 2021, inquiring about purchasing methamphetamine.  AUSTEN replied to the CI that he did not have any.  Then on August 24, 2021, the CI spoke with AUSTEN again and AUSTEN told the CI that he was ready, which your Affiant understood to mean that AUSTEN had drugs for sale.

191.    On August 25, 2021, TFO Grossman was conducting surveillance at **TARGET RESIDENCE 8** and observed the same black Infiniti sedan that AUSTEN was seen driving on June 9, 2021, parked at **TARGET RESIDENCE 8**.

## **TARGET RESIDENCE 9**

192.    This Affidavit also seeks a warrant to search for Chad GASBARRE, who is an associate of SHOENING, WHITAKER, and KELLY, at 3582 Route 219, Brockway, PA 15824.

193.    On July 22, 2020, Trp. Howell interviewed a confidential source, hereinafter referred to as CS2[3], at PSP Clearfield.  During the interview the CS2 related the following information:  CS2 stated that Ryan SCHOENING aka "Niner" had just sent out $100,000.00 on July 21, 2020 to an individual in the state of California for methamphetamine.  CS2 related that he/she was present during this process on July 20, 2020.  CS2 stated that all the money was prepared at Chad GASBARRE's residence at 3596 Route 219, Brockway 15824.  CS2 related that four boxes were prepared for the $100k, and each would contain $25,000.00.

---

3 CS2 was referred to as CS2 throughout the wiretap affidavits written during the course of this investigation.  CS2 informed investigators that SCHOENING took control of the Organization while HILLEBRAND was incarcerated.  In 2020, CS2 was arrested in Clearfield County for a parole violation resulting from the distribution of methamphetamine and is currently being housed at a PA state prison.  CS2 agreed to cooperate for prosecutorial consideration. CS2 has convictions for the following offenses: felony drug violation, misdemeanor drug violations, and misdemeanor theft.

194.    CS2 stated the process for packaging the money goes as follows:  SCHOENING takes a picture of a new box and sends a text to the individual in California.  The boxes are then spray foamed on the inside and lined with newspaper.  Another picture is taken and sent to individual in California. The boxes are then filled with money, to which the money is wrapped tight with cellophane wrapping.  Another picture is taken and sent via text.  The money is then covered with newspaper and spray foam.  Another picture is taken and sent via text.  The labels are then filled out by separate people, so the handwriting is never the same, and placed on the box.  Another picture is taken and sent via text.  The boxes are then transported to a Post Office, once at the post office a picture is taken and sent via text.  The boxes are then hand delivered, paid with cash usually for priority mail.  Once a receipt is received by postal personnel, a picture is taken of the receipt and sent via text.  By this point the individual in California has already received address from SCHOENING for the methamphetamine to be delivered, via U.S. postal services.

195.    CS2 also related, once the $100,000 was packaged CS2 and SCHOENING got into his vehicle and followed who he thought to be Kristen Sue RENWICK, to the Brockway Post office.  CS2 related that RENWICK took two boxes' containing $25,000 each and hand delivered to the Brockway post office.  CS2 stated that SCHOENING wanted him to deliver the other two boxes of cash to the Falls Creek post office, however CS2 stated he couldn't due to prior family commitments.  CS2 related he does not know who delivered the other two boxes of cash.

196.    During the interview, CS2 went on to state that SCHOENING has been distributing methamphetamine for a while, and has been receiving around 15 pounds of meth a

week from California.  CS2 also advised that SCHOENING also receives marijuana through the mail, and it's the same process as the methamphetamine.  Trp. Howell asked CS2 about the process once the meth is received from California.  CS2 related that SCHOENING will use an address approximately three times to receive packages, then he picks a different address.

197.    CS2 related that once SCHOENING receives the meth, a lot of the deals happen on a back road off Fermantown Road, Snyder Township, Jefferson County.  CS2 related SCHOENING usually carries the meth on his person until it is distributed out.  CS2 related that SCHOENING'S right hand man is Chad GASBARRE.  CS2 related that he/she believes that SCHOENING is preparing GASBARRE to take over the operation in case SCHOENING is caught and taken to jail.  CS2 related that he doesn't know exactly where SCHOENING stays. He/she believes SCHOENING has houses all over the place to which he stays or keeps all his belongings.

198.    On July 29, 2020, Trp. Lance Howell was conducting surveillance at Chad GASBARRE'S residence, **TARGET RESIDENCE 9** based on the information Trp. Howell received from CS2 on July 22, 2020.  At approximately 10:00 am, Trp. Howell drove by **TARGET TELEPHONE 9** and observed an older GMC pickup bearing PA registration ZPJ6908, along with an orange in color motorcycle.  Trp. Howell also observed two white males sitting on the front porch of **TARGET TELEPHONE 9**. It appeared the two males were waiting on someone or something.

199.    A records check of the registration on the GMC truck indicated the truck was registered to Darren DOUGLAS, a distributor for Ryan SHCOENING and Derek HILLEBRAND.  Trp. Howell proceeded to park his vehicle south of **TARGET RESIDENCE**

**9**, and out of sight.  After sitting for approximately 30 minutes, Trp. Howell did not observe either the GMC truck or orange motorcycle come past his location.  Trp. Howell proceeded to drive past **TARGET RESIDENCE 9** once again to which he observed two males around the GMC truck.  Trp. Howell was able to confirm through a JNet Photo and Facebook that the one male individual was Daren DOUGLAS.

200.     Trp. Howell then pulled into O&I glass plant where he sat for several minutes. Trp. Howell decided to not go past **TARGET RECIDENCE 9** again due to possibly being detected, so he proceeded to travel on a back-dirt road which would be south of **TARGET RESIDENCE 9**.  As Trp. Howell was traveling south on Coder Road, Snyder Township, Jefferson County, when he came upon the GMC truck, orange motorcycle, and a black Pontiac G6.  All three vehicles were blocking the roadway, and Trp. Howell observed 3 males outside their vehicles.  It appeared that some sort of drug deal was occurring.  The one male got into the Pontiac G6, and backed the vehicle up so Trp. Howell could get bye.

201.     Through information that Trp. Howell obtained it was believed that the male in the black Pontiac G6 was GASBARRE.  Trp. Howell was provided information on July 22, 2020 that GASBARRE drives a black Pontiac G6.  As Trp. Howell approached the three individuals, he was able to obtain the registration off the orange motorcycle with was 9KE45. Trp. Howell also identified DOUGLAS as one of the individuals, however he could not identify the other two individuals.

202.     On August 5, 2021, TFO Eric Harpster and PSP. Tpr. James Price interviewed a confidential source of information, hereinafter referred to as CI.  The CI stated that he/she has been purchasing methamphetamine from Chad GASBARRE for 3 years consistently.  The CS

stated that between February 2021 until his most recent incarceration on June 11, 2021, he/she has met with GASBARRE every day or every other day and would purchase anywhere between ¼ pound to 1 pound of methamphetamine.  The CS stated that on most days he/she would purchase 1 pound of methamphetamine.  The CS stated that he/she would go directly to **TARGET RESIDENCE 9** to meet with GASBARRE and on most occasions Ryan SCHOENING a.k.a. "Niner" would also be present.  The CS stated that when he/she went to the residence they would meet inside the house or in the detached garage also on the property. The CS stated that when GASBARRE did not have the methamphetamine at **TARGET RESIDENCE 9**, GASBARRE would instruct the CS to meet him at a house on Clay Plant Rd. which he/she believes is possibly owned by SCHOENING.  The CS stated that the house on Clay Plant Rd also has a garage and he/she has observed a large safe at that residence as well. The CS stated that GASBARRE would also have the CS meet him/her on a dirt road off of Odin Rd. above Brockport, PA.

203.    The CS stated that he/she most recently purchased 23 grams of methamphetamine from GASBARRE at **TARGET RESIDENCE 9** where he/she met GASBARRE inside the garage and purchased the 23 grams for $500.00 the week of August 16, 2021.

204.    Investigators know GASBARRE to live at 3582 Route 219, Brockway, PA 15824. On August 20, 2021, Cpl. Bryan Ripple drove by GASBARRE's residence and saw GASBARRE, in addition to the white Jeep and black Pontiac that investigators know him to drive.

205.    On August 23, 2021, SA Coleman conducted a query of Accurint, which shows GASBARRE to be currently associated with **TARGET RESIDENCE 9**.

206.   Also, on August 23, 2021, SA Coleman queried JNet and found a PA driver's license in which GASBARRE uses **TARGET RESIDENCE 9**.

207.   On August 23, 2021, SA Coleman reviewed GASBARRE's criminal history.  As of GASBARRE's most recent arrest in 2020, he provided the address of **TARGET RESIDENCE 9**.  On or about December 17, 2004, GASBARRE pleaded guilty to burglary.  On or about July 7, 2005, GASBARRE pleaded guilty to drug paraphernalia.  On or about December 17, 2006, GASBARRE pleaded guilty to DUI.

208.   Based on the above described investigation, Your Affiant believes that evidence of violations of Title 21, United States Code, Section 841 (distribution and possession with intent to distribute controlled substances), 21 United States Code 846 (conspiracy), and Title 18 United States Code 1956 (money laundering) (the TARGET OFFENSES), that being the possession with intent to distribute methamphetamine and marijuana as well as proceeds of the distribution of methamphetamine and marijuana, will be located within the **TARGET RESIDENCES**.

209.   Based on the above, your Affiant believe that the items, documents and records listed in Attachment B to the requested search warrant constitute evidence, fruits and instrumentalities relating to the TARGET OFFENSES, that may be found at the **TARGET RESIDENCES**, as described in Attachment A.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

210.   As described above and in Attachment B, this application seeks permission to search for records that might be found in the **TARGET RESIDENCES**, in whatever form they are found.  One form in which the records might be found at the **TARGET RESIDENCES** is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would

authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41I(2)(B).

   a. *Probable cause.*  I submit that if a computer or storage medium is found at the **TARGET RESIDENCES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons: Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

  211. *Forensic evidence.*  As further described in Attachment B-1, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET RESIDENCES** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or

image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not

present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

       f.     I know that when an individual uses a computer to purchase narcotics on the DarkNet or through other online vendors, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

212.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

213.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

214.    Because several people may share each of the **TARGET RESIDENCES** as a residence, it is possible that the **TARGET RESIDENCES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this application could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **REQUEST FOR SEALING**

215.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## <u>CONCLUSION</u>

216.    I submit that this affidavit supports probable cause for a warrant to search the **TARGET RESIDENCES**, described in Attachment A and seize the items described in Attachment B.

The above information is true and correct to the best of my knowledge, information and belief.

*/s/ Eric Harpster* _____
DEA TFO ERIC HARPSTER

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 30th day of August 2021.

_____
HONORABLE PATRICIA L. DODGE
United States Magistrate Judge

# ATTACHMENT A-1

**41 HORSESHOE DRIVE, REYNOLDSVILLE, PA 15851**, **TARGET RESIDENCE 1,** is further described as a two-story residence with multi-colored siding, and an enclosed porch on the front of the residence, located in Winslow Township, Jefferson County.  The back of the residence has a white door located near the center of the residence.  The right side of the house also has a small attached enclosed porch.



## ATTACHMENT A-2

**44 HORSESHOE DRIVE, REYNOLDSVILLE, PA 15851, TARGET RESIDENCE 2,** is further described as a two-story residence, with dark brown siding and a green metal roof. The first level of the residence consists of a single car garage, with a white garage door, and brick surrounding the garage door. There is a door to enter the first level of the residence just left of the garage door. The back side of the residence has an attached porch with a door to enter the second level of the residence.



## **ATTACHMENT A-3**

**1602 Salem Road, Dubois, PA 15801, TARGET RESIDENCE 3,** is further described as two-story, single-family residence that is beige in color, with a green roof.  There is a brown front door in the front of the residence and an open porch at the back. There is a driveway at the front, right of the residence.



# **ATTACHMENT A-4**

**221 Van Ness Street, Sykesville, PA 15865**, **TARGET RESIDENCE 4,** is further described as single-family, ranch style house with white siding and brown shingles on the roof. The right front portion of the residence has a covered porch, with a white front door. The left side of the house has a small white garage door, with a man door just to the left of the garage door.



## ATTACHMENT A-5

**1957 Clark Road, Olanta, PA 16863, TARGET RESIDENCE 5,** is further described as a single-family single-story residence that has multicolored siding with a covered front porch.  The front porch has a green metal roof, with the residence having black in color shingles.  The property also contains a single-story white in color mobile home, with a door on the backside of the trailer.



## ATTACHMENT A-6

**232 Seabright Street, Pittsburgh, PA 15214, TARGET RESIDENCE 6,** is further described as a two-story, single-family residence, red and white in color.  There is an open porch, where the door is in the front left of the residence, and the driveway is on the right side of the residence. The mailbox is affixed to the residence, to the right of the door.



## ATTACHMENT A-7

**2915 Potomac Avenue, Pittsburgh, PA 15216, TARGET RESIDENCE 7,** is further described as a two-story, single-family residence. The residence is beige and brown in color. The numbers "2915" are on the left side of the door. The driveway is off to the left of the residence. There appears to be an integral garage.



# ATTACHMENT A-8

**2805 Custer Avenue, Pittsburgh, PA 15227, TARGET RESIDENCE 8,** is further described as a single-story brick pizza shop, with living quarters in the basement. This search is just for the apartment in the basement, not the pizza shop.



## ATTACHMENT A-9

3582 Route 219, Brockway, PA 15824, **TARGET RESIDENCE 9,** is further described as a two-story, single-family and light-colored residence.  There is an open front porch, with the numbers on the right of the door.  There is a mailbox at the edge of the road and a driveway to the left of the residence with a free-standing garage.



# ATTACHMENT B

## PROPERTY TO BE SEIZED

Evidence, instrumentalities, contraband, or fruits of violations of  Title 21 United States Code, Section 841 (distribution and possession with intent to distribute controlled substances) and Title 21 United States Code 846 (conspiracy), Title 18 United States Code 1956 (money laundering), (the TARGET OFFENSES), including the following:

a) Any and all controlled substances;

b) Drug paraphernalia, to include narcotics cutting agents, glassine baggies, smoking pipes, grinders, digital scales, decoy can-safes, hydraulic presses, and any other type of device/equipment that can be used to ingest, inject, inhale, consume and/or introduce into the human body any illegal narcotics.

c) Items that also may be used to manufacture, compound, convert, process, produce, prepare, test, analyze, package, repackage, store, contain, manufacture, cultivate, and/or conceal;

d) Diluents and adulterants, such as quinine hydrochloride, mannitol, mannite, dextrose, and lactose, used, intended for use or designed for use in cutting a controlled substance.

e) Financial and business records, whether or not maintained electronically or by computer, including, but not limited to: books, records, receipts, notes, ledgers, journals, memoranda, address and/or telephone books, tapes, computer disks, computers relating to the transportation, ordering, purchase and distribution of controlled substances; United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds;

f) Documents indicating travel in interstate and foreign commerce, to include

airline tickets; notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel-related businesses; airline, rent-a-car, and hotel frequent flier or user cards and statements; passports and visas; papers or documents of identity/nationality; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

g)      Books, records, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks, bank deposit tickets, safe deposit box keys, and memoranda and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

h)      United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds;

i)      Photographs, in particular, photographs of co-conspirators, of assets and/or of controlled substances;

j)      Indicia of occupancy, residence and/or ownership of the premises described above, including but not limited to utility and telephone bills, canceled envelopes, and keys;

k)      Any and all firearms which may be used to facilitate transactions in controlled substances;

l)      Mail matter (all classes), Priority Mail , Priority Mail Express, and International Mail parcels and packaging, DHL, FedEx, and UPS parcels and packaging, customs declarations and other records, and other correspondence which reflect names and addresses of suspected co-conspirators in the trafficking and mailing of drugs and cash proceeds; and

m)      Any computer, computing device, laptops, tablet, smartphones, cellular

telephones, external hard drives, computer hardware, software, related documentation, and electronic storage media, so that computer analysts can accurately retrieve the items authorized by this warrant in a laboratory or other controlled environment.

n)    Any power cords, lightning cables, or any other chargers designed to charge the battery on any electronic devices that are seized.

For any computer, laptops, cell phones, tablets, or storage medium, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a)    Any and all evidence related to the TARGET OFFENSES, including correspondence and/or communications,

b)    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

c)    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d)    evidence of the lack of such malicious software;

e)    evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of COMPUTER access, use, and events relating to crime under investigation and to the COMPUTER user;

f)    evidence indicating the COMPUTER user's state of mind as it relates to the

TARGET OFFENSES;

g)      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h)      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i)      evidence of the times the COMPUTER was used;

j)      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k)      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l)      records of or information about Internet Protocol addresses used by the COMPUTER;

m)      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n)      contextual information from the COMPUTER necessary to understand the evidence described in this attachment.

In searching the COMPUTER, the federal agents may examine all of the data contained in the COMPUTER to view its precise contents and determine whether the COMPUTER and/or data falls within the items to be seized as set forth above. In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.

For those COMPUTERS found within a search location where multiple individuals, in addition to the target of this investigation are located, federal agents will make reasonable efforts to ascertain whether the COMPUTER is used by or belongs to a target of the investigation to facilitate the commission of the TARGET OFFENSES. To the extent it becomes readily apparent that the COMPUTER was unlikely used in conjunction with or to facilitate in any way the commission of the TARGET OFFENSES, federal agents will not seize or search the COMPUTER beyond that which is necessary to ascertain the nature of its involvement in the TARGET OFFENSES.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, gambling machines, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## **ITEMS TO BE SEIZED FROM ELECTRONIC STORAGE MEDIA**

A.      Incoming and outgoing e-mails, chats, instant messages, texts messages, or any other types of communications, as well as call, text message, or other types of communication logs;

B.      Internet browser histories showing what internet sites were visited, for how long, and how often;

C.      Contact lists;

D.      Photo and video galleries;

E.      Navigation, mapping, and GPS files;

F.      For cellular telephones - telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone;

G.      Evidence indicating who used the electronic device and when; and

H.      Any of the items set forth section I of this attachment that are capable of being stored electronically.